[Cite as *State v. Hartley*, 194 Ohio App.3d 486, 2011-Ohio-2530.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| THE STATE OF OHIO, | : | APPEAL NOS. C-100515 |
| | | C-100516 |
| Appellee, | : | C-100517 |
| | | C-100518 |
| v. | : | C-100519 |
| | | C-100520 |
| HARTLEY, | : | TRIAL NOS. C-10CRB-6732A |
| | | C-10CRB-6732B |
| Appellant. | : | C-10CRB-6732C |
| | | C-10CRB-6734A |
| | : | C-10CRB-6734B |
| | | C-10CRB-6734C |
| | : | |
| | : | *D E C I S I O N.* |

Criminal Appeals From:  Hamilton County Municipal Court

Judgments Appealed from Are:  Affirmed in C-100515, C-100516, and C-100517;
　　　　　　　　　　　　　Reversed and Appellant Discharged in C-100518,
　　　　　　　　　　　　　C-100519, and  C-100520

Date of Judgment Entry on Appeal:  May 27, 2011


　　　Joseph T. Deters, Hamilton County Prosecuting Attorney, and Rachel Lipman
Curran, Assistant Prosecuting Attorney, for appellee.

　　　Michael W. Welsh, for appellant.



Please note:  This case has been removed from the accelerated calendar.

Per Curiam.

{¶1}    In these consolidated appeals, defendant-appellant, Pamela Hartley, challenges her convictions on three counts of endangering children[1] and three counts of misrepresentation by a child-care provider.[2]

{¶2}    Hartley, the director of a licensed child-daycare center, repeatedly gave young children under her care pills containing a supplement of the hormone melatonin to cause them to sleep in the afternoon.  Although Hartley failed to disclose to the children's parents that she was administering the supplement, she did not affirmatively misrepresent its use.

{¶3}    For the reasons that follow, in the appeals numbered C-100515, C-100516, and C-100517, we affirm Hartley's child-endangering convictions, but in the appeals numbered C-100518, C-100519, and C-100520, we reverse Hartley's convictions for misrepresentation by a child-care provider.

## Background Information

{¶4}    On December 14, 2009, Lieutenant David Schaefer of the Springfield Township Police Department went to the Covenant Church Day Care Center to investigate allegations from two employees that Hartley had been giving supplements of the hormone melatonin to children at the daycare center to make them sleep.  Melatonin is a hormone naturally produced by the body in greater quantities when it is dark to help maintain a regular sleep pattern.

{¶5}    When Schaefer asked Hartley about the allegations, she had already denied the same allegations to the pastor of the Covenant Church.  But Hartley

---

[1] C-10CRB-6732A, C-10CRB-6732B, and C-10CRB-6732C.

[2] C-10CRB-6734A, C-10CRB-6734B, and C-10CRB-6734C.

admitted to Schaefer that she had given melatonin pills to three children on several occasions by placing a pill in the center of a folded-over Tootsie Roll. The three children whom Hartley identified were under the age of three.

{¶6} Hartley told Schaefer that she had purchased the bottle of supplements at the grocery store and that the bottle was located in her desk drawer. Detective Rob Merkle, who had accompanied Schaefer to the daycare center, located a Tootsie Roll stuffed with a white pill in the garbage can below Hartley's desk. But Merkle could not find Hartley's bottle of melatonin supplements in her desk.

{¶7} Schaefer and Merkle interviewed Hartley two days later at the Springdale Township Police Department. In this recorded interview, Hartley again admitted to giving the hormonal supplements to three children within her care on multiple occasions because the children would not sleep during naptime. She claimed that she had begun administering the supplement in late August 2009 on the advice of a subordinate, later identified as Donna Scott, who was in charge of the infant room at the daycare center. Hartley claimed that she stopped giving the supplement after a few weeks. Later in the interview, however, she admitted that before leaving on a vacation scheduled for the first week of October 2009, she had left a bag of adulterated Tootsie Rolls with an employee for the employee to use in her absence.

{¶8} Hartley further stated that she had read "a little" about the supplement and learned that it was "supposed to be totally safe." She "believe[d]" that she had purchased 3 mg pills, but she was not certain if she had given a whole pill or half of a pill, and she admitted that she had increased the dosage when a lower dosage had not worked. Hartley told Merkle and Schaefer that she had ceased

administering the pills because she had not obtained consent from the children's parents.

{¶9}    Hartley admitted that the supplements, which she stored in her office desk, were accessible to the other providers at the daycare center to give to the children.  She knew that Scott, who stored her own bottle of the supplement in Hartley's desk, had given the supplement on one occasion to a child in the infant room.  And she strongly suspected that Scott had continued to give the supplements to infants.  Although Hartley considered it unsafe to give the supplement to infants, she did no more than to tell Scott to stop.

{¶10}    Hartley was subsequently arrested and charged with three counts of endangering children, in violation of R.C. 2919.22(A), and three counts of misrepresentation by a child-care provider, in violation of R.C. 2919.224.

{¶11}    At a bench trial, Aimee Coyle and Ashlee Jerrigan, the two daycare-center employees who had alerted the police to Hartley's conduct, testified against Hartley.  Coyle testified that in late July or early August 2009, after she had been promoted to the lead teacher for the toddler room, which was used for children aged 18 months to 3 years, Hartley told her, "We're putting melatonin in the Tootsie Rolls for the kids."  Coyle further contended that she had repeatedly observed Hartley give to the toddlers the adulterated candy containing a full pill each day before lunch from late July or early August until December 2009, when Coyle contacted the police.

{¶12}    According to Coyle's observations, on the days that the children were given the supplement, they would nap longer and sometimes fall asleep while eating lunch.  Coyle brought to the police a small bag containing what she believed were 5

4

mg supplements of melatonin, given to her by Scott, but the pills were not marked and their contents were not confirmed by a report of forensic testing.

{¶13} Jerrigan testified that in December 2009, she had seen Hartley give a Tootsie Roll to a toddler. When Hartley left the room, Jerrigan removed the candy from the child's mouth and found a white pill in it. She brought the candy and the pill to the Springdale police.

{¶14} Schaefer and Merkle testified about Hartley's admissions during her two interviews, and the recording of her second interview was offered into evidence. Over Hartley's objection, Merkle testified that while doing research for the case, he had learned from a University of Maryland website that the use of melatonin supplements could cause sleepiness during the day. With respect to children specifically, he learned that the supplement could cause side effects such as high blood pressure and seizures. According to Merkle, the website also included a representation that "it was bad if a child up to the age of 15 had any more than .3 milligrams."

{¶15} The state also presented testimony about the effects of the supplements from the parents of the three children to whom Hartley had admittedly given the supplement. These parents recalled that during the time period at issue, the children seemed "groggy" in the afternoon and that the children's sleep pattern had become disturbed. In addition, one parent testified that her son's language skills had regressed and that he would awaken screaming in the middle of the night before she removed him from the daycare center.

{¶16} All of these parents testified that they had not given Hartley permission to give the supplement to their children and claimed that they would not have given her permission to do so.

{¶17}   Shelly Hendricks, the pastor of the Covenant Church and Hartley's superior, testified that under a state-mandated protocol the daycare center could not administer any medication to a child without signed authorization from a parent. Further, he claimed to have been unaware that Hartley, who never sought reimbursement for her purchase of the supplement, had been giving it to the children.   Finally, he testified that Hartley had denied administering the supplements to the children when he asked her about it on the morning of December 13, 2007, and that he had fired Hartley later that day, after learning of her admissions at the police interview.

{¶18}   The trial court found Hartley guilty on all counts of endangering children and misrepresentation by a child-care provider.   Concerning the endangering-children counts, the court acknowledged that the state had failed to present any expert medical evidence establishing the harmful effects of taking the supplement, but it determined that the other evidence supported a finding of a substantial risk to the health or safety of the children.   And with respect to the misrepresentation counts, the court found no affirmative representation by Hartley that was actionable under the misrepresentation statute.   But the court held that the statute criminalized Hartley's failure to disclose to the parents of the children in her care that she was giving the children melatonin supplements.   These appeals followed.

## Evidentiary Issues

{¶19}   In her second and third assignments of error, which we address first, Hartley challenges Detective Merkle's testimony concerning the potential harmful effect of melatonin on small children that he had learned from the University of Maryland website.   Specifically, in her second assignment, she contends that this

testimony was not admissible lay or expert testimony as defined under Evid.R. 701 and 702; in her third assignment of error, she argues that the testimony was inadmissible hearsay.

{¶20} The state argues that Merkle's testimony was not offered for the truth of the matter asserted but rather to explain the course of Merkle's investigation and to demonstrate the recklessness of Hartley's conduct in failing to discover and heed warnings about the use of the supplement in children.

{¶21} We agree with the state that Merkle's testimony on the potential harmful effects of giving melatonin supplements to small children was admissible to demonstrate the ease of obtaining this information about the supplement. As a person who had actually researched the issue and therefore had the foundational personal knowledge, Merkle was competent to offer this testimony. And part of the state's case against Hartley was that she had been reckless in giving the children the supplement without determining whether it was accepted as safe.

{¶22} Further, the trial court clarified that it had not considered the testimony as substantive medical evidence of a substantial risk to health. Thus, we hold that this part of Merkle's testimony was not offered or accepted for the truth and therefore that it was not hearsay and was not lay or expert opinion that fell outside Evid.R. 701 and 702. The second and third assignments of error are meritless, and we overrule them.

## Sufficiency-of-the-Evidence Claim

{¶23} In her first assignment of error, Hartley argues that her convictions for the offenses of endangering children and misrepresentation by a child-care provider were not supported by sufficient evidence. On a sufficiency-of-the-evidence review, the relevant inquiry is whether, after viewing the evidence in the light most

favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[3]

### Endangering Children

{¶24}   With respect to the three counts of endangering children, the state was required to prove that Hartley, while having control or serving in loco parentis of a child, had recklessly created a "substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."[4]   Hartley contends that her conduct was not reckless and did not create a substantial risk to the health or safety of the children.

### 1. Substantial Risk to Health or Safety

{¶25}   Hartley contends that the state failed to present sufficient evidence that her actions created any risk to the health or safety of the children, much less a substantial risk.   We have already held that Merkle's testimony concerning the harmful effects of the supplement that he found on the website was not admissible for its truth.   Certainly if the state had presented testimony from a qualified medical expert, the case against Hartley would have been much stronger, because the website information detailed specific and more serious side effects of the supplement such as seizures.   But the statute does not require such testimony to support a conviction in all cases.   Expert medical testimony is not required where the creation of a risk to health or safety is within common knowledge.[5]

---

[3] *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781.

[4] R.C. 2919.22(A).

[5] See *State v. Caton* (2000), 137 Ohio App.3d 742, 751-752, 739 N.E.2d 1176 (holding that in an endangering-children prosecution, the state is not required to present expert testimony to prove that feces and insects were potential sources of disease that constituted a substantial risk to the health of a child).

{¶26} We consider it to be within common knowledge that adding to the natural production of a hormone that contributes to sleepiness may cause unnatural sleepiness and disrupt natural sleep patterns, resulting in less than normal awake time for development and the intake of nutrition. And it is within common knowledge that the administration of any supplement to induce sleep to a young child without a doctor's supervision, without knowledge of medications simultaneously taken by the child and the child's medical conditions, and without accurate knowledge of dosing may cause an overdose and fails to consider contraindication. Further, it is common knowledge that choking can occur if a child falls asleep while eating and that a sleepy young child is more likely to fall and injure himself. All of these scenarios involve risks to health or safety.

{¶27} The question ultimately is whether all of these factors combined to put the children's health and safety at substantial risk. A substantial risk involves a "strong possibility, as contrasted with a remote or significant possibility."[6] A finding of substantial risk may not be based on " 'an inference upon an inference' in order to transform a speculative risk into a substantial risk."[7]

{¶28} Hartley repeatedly and indiscriminately administered the supplements to young children, without knowledge of the precise dosage requirements for each child's much smaller blood-stream, and that she did so without the consent or knowledge of the parents, in violation of the daycare center's protocol. The children repeatedly fell asleep during lunch, they were constantly sleepy, and their sleep patterns were disrupted for months. Further, parents testified that their children's sleep patterns had returned to normal after they stopped

---

[6] R.C. 2901.01(A)(8).
[7] *Caton*, supra, at 751, quoting *State v. Martin* (1999), 134 Ohio App.3d 41, 44, 730 N.E.2d 386.

attending the daycare center. And one parent even testified that after she had pulled her child from the daycare center, not only had her child's sleep pattern returned to normal, but the child had also resumed developing linguistically. This evidence supported a finding that Hartley's acts and omissions created a strong possibility of harm to the health or safety of the children.

{¶29} Hartley compares this case to other cases from this district in which the state's evidence on substantial risk was too speculative to support a conviction for endangering children under R.C. 2919.22(A). But evaluating the likelihood of a risk involves a fact-intensive inquiry.[8] And this case is distinguishable because the state presented evidence that Hartley had actually harmed the health of the children, and that she did so repeatedly.[9] Therefore, we hold that the evidence, if believed, established that the risk to health or safety was not speculative but substantial.

### 2. Recklessness

{¶30} The Ohio Supreme Court has held that recklessness is the required degree of culpability for a violation of R.C. 2919.22(A), although no degree of culpability is specified in the statute.[10] "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his

---

[8] See Id.

[9] Compare *State v. Allen* (2000), 140 Ohio App.3d 322, 747 N.E.2d 315 (holding that a father's conduct in leaving his seven-year-old child unsupervised at home for 20 minutes while he left to borrow butter from a neighbor did not, as a matter of law, create a substantial risk to the child's health or safety); *State v. Boone* (Aug. 14, 1996), 1st Dist. N0. C-950427 (holding that a mother's method of disciplining her seven-year-old child by driving away and leaving him in a K-Mart parking lot for 15 minutes did not, as a matter of law, create a substantial risk to the child's health or safety); *State v. Graves* (1992), 62 Ohio Misc.2d 358, 598 N.E.2d 914 (holding that a father's operation of a motor vehicle while intoxicated and while his children were unbuckled in the back seat did not, as a matter of law, create a substantial risk to the children's health or safety).

[10] *State v. McGee* (1997), 79 Ohio St.3d 193, 680 N.E.2d 975, syllabus.

conduct is likely to cause a certain result or is likely to be of a certain nature."[11] "[S]omething is likely when there is merely good reason for expectation or belief."[12]

{¶31} A reckless act involves a more culpable mental state than a negligent act: "A person acts negligently when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that his conduct may cause a certain result or may be of a certain nature."[13] But a reckless act involves less culpability than a knowing act: "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature."[14]

{¶32} Hartley contends that the state failed to prove recklessness. The issue then is whether the state presented evidence from which any rational trier of fact could have found beyond a reasonable doubt that Hartley, as a child-daycare provider, had been more than just negligent and was actually reckless in her administration of the supplements to the children. We hold that it did.

{¶33} First, Hartley's own statement to the police that she realized that the use of the supplements in infants was too dangerous demonstrates that she was reckless in administering the supplements to children who were only months older, as she failed to articulate how this danger was different for the older children. Moreover, Merkle testified that he had easily found on the Internet information warning about the use of the supplements in all children. The ready availability of the warnings created an inference that Hartley either ignored the warnings or did not

---

[11] R.C. 2901.22(C).

[12] 1974 Legislative Service Commission staff comment to H.B. No. 511.

[13] R.C. 2901.22(D).

[14] R.C. 2901.22(B).

undertake any research, both of which demonstrated recklessness under the circumstances of this case.

{¶34}  Additionally, Hartley was not sure of the dosage that she had introduced into the bloodstream of the children, and she had used the pills indiscriminately, without regard for any medical conditions of the children.  Finally, Hartley even acknowledged that she should have obtained parental consent before giving the supplements.  This acknowledgement, along with her initial denial of the conduct to the pastor and the evidence that she had never sought reimbursement for the bottle of supplements, indicated that she knew the wrongfulness of her conduct and had acted recklessly in administering the supplements.[15]

{¶35}  After reviewing the evidence at trial in the light most favorable to the state, as we are required to do, we conclude that a reasonable trier of fact could have found beyond a reasonable doubt all the elements of endangering children.

### Misrepresentation by a Child-Care Provider

{¶36}  Hartley was convicted of misrepresentation by a child-care provider, in violation of R.C. 2919.224, for failing to disclose to parents that she had administered the melatonin supplements to their children while in her care.  R.C. 2929.224 provides:  "No child care provider shall knowingly misrepresent any factor or condition that relates to the provision of child care and that substantially affects the health or safety of any child or children in that provider's facility or receiving child care from that provider to * * * [a] parent * * *."  The phrase "any factor or condition that relates to the provision of child care" includes such matters as "the

---

[15] Compare *State v. Massey* (1998), 128 Ohio App.3d 438, 715 N.E.2d 235 (holding that a mother's conduct in leaving a two-and-one-half-year-old child in bathtub for 30 seconds to four minutes to care for another child and positioning child on potty seat after child had just fallen off the seat without knowing that he was likely to fall again was arguably negligent but not reckless).

person or persons who will provide child care to the child of the parent" and "[t]he conditions or safety features of the child care facility," but the statute does not create an exhaustive list.

{¶37}   Hartley challenges her misrepresentation convictions on the ground that her failure to disclose was an omission and therefore was not a misrepresentation under the statute.  Hartley further contends that any potential misrepresentation did not relate to any matter substantially affecting the health or safety of any child for whom she provided care.

{¶38}   **Does R.C. 2919.224 Criminalize Omissions?**

{¶39}   The issue of whether, for purposes of R.C. 2919.224, the proscribed act of knowingly misrepresenting any factor or condition that relates to the provision of child care includes the failure to disclose is one of first impression in Ohio.

{¶40}   The General Assembly enacted R.C. 2919.223 through 2919.227, including R.C. 2919.224, as part of 2004 Am.Sub. H.B. No. 11, which became effective in 2005. R.C. 2919.223 sets forth definitions that apply to R.C. 2919.224 through 2919.227, but it does not define the phrase "knowingly misrepresent."

{¶41}   The main goal of statutory construction is to determine and give effect to the intent of the legislature.  To that end, we first look to the words used by the General Assembly, remembering that "words and phrases in Ohio statutes are to be construed 'according to the rules of grammar and common usage.' "[16] Additionally, we are mindful that the criminal statutes are to be strictly construed against the state and in favor of the accused.[17]

---

[16] *State v. Gray* (1992), 62 Ohio St.3d 514, 515, 584 N.E.2d 710, quoting R.C. 1.42.

[17] Id., citing R.C. 2901.04.

{¶42} As we have noted, the term "misrepresent" is not defined in R.C. Chapter 2919. But the plain and ordinary meaning of the term is "[t]o represent incorrectly; as: **a** To give a false, improper, or imperfect representation (of). **b** To disserve or act counter to as a representative."[18] The only meaning relevant to this case is the first meaning. And that meaning involves the giving of a representation, not an omission or a nondisclosure. In light of this definition, we conclude that the legislature did not intend to give the statute the broad interpretation that the trial court gave to it.

{¶43} The Ohio Supreme Court in *State v. Warner* addressed a similar issue of statutory interpretation.[19] The court held that two subdivisions of the securities-fraud statutes, R.C. 1707.44(B)(4) and 1707.44(J), prohibit only affirmative misrepresentation and that they do not apply to fraudulent nondisclosure.[20] R.C. 1707.44(B)(4) states that a defendant commits a violation when he or she "knowingly make[s] or cause[s] to be made any false representation[s]"; R.C. 1707.44(J) states that "[n]o person, with purpose to deceive, shall make, issue, publish, or cause to be made, issued, or published any statement or advertisement as to the value of securities, * * * or as to the financial condition of any issuer of securities, when such person knows that the statement or advertisement is false in any material respect."

{¶44} The *Warner* court noted that "[t]he elements of a crime must be gathered wholly from the statute," and it then presumed that "if the General Assembly intended that a party be held accountable for a failure to disclose under

---

[18] Webster's Second New International Dictionary (1959) 1570.

[19] *State v. Warner* (1990), 55 Ohio St.3d 31, 564 N.E.2d 18.

[20] Id. at paragraph two of the syllabus.

R.C. 1707.04(B)(4) or 1707.44(J), it would have included the appropriate language in the statute."[21]

{¶45} Likewise, in this case, if the legislature had intended the broad reach adopted by the trial court and advocated by the state, it could have done so by including the following emphasized language in R.C. 2919.224: "No child care provider shall knowingly misrepresent any factor or condition or *knowingly fail to disclose any factor or condition* that relates to the provision of child care * * *." As proof of its ability to accomplish this, the legislature criminalized the failure to disclose in R.C. 2919.225 and 2919.227. Because the legislature did not include this language in R.C. 2919.224, the misrepresentation statute, we presume that it did not intend for the statute to apply to a child-care provider's failure to disclose to a parent a factor or condition that relates to the provision of child care.

{¶46} We have determined that R.C. 2919.224 does not apply to omissions, and there is no legally sufficient evidence in this record to support a violation of the statute based on an affirmative misrepresentation. Although the daycare center had a protocol of notifying and receiving consent from parents before administering "anything" to the children, there was no testimony that Hartley had communicated this policy to any parent. Testimony from one parent that Hartley had asked for his consent before she had administered Benadryl to his child did not demonstrate that Hartley had affirmatively misrepresented the daycare center's policy. Accordingly, on this basis, we sustain the first assignment of error in part, reverse Hartley's misrepresentation convictions, and discharge her from further prosecution for those offenses.

### Weight-of-the-Evidence Challenge

---

[21] Id. at 52.

{¶47} In her fourth assignment of error, Hartley argues that her endangering-children convictions were against the manifest weight of the evidence. But our review of the record fails to persuade us that the trial court, sitting as the trier of fact, clearly lost its way and created such a manifest miscarriage of justice that the endangering-children convictions must be reversed and a new trial ordered.[22] The weight to be given the evidence and the credibility of the witnesses were primarily for the trier of fact to determine.[23]

{¶48} Hartley's contention, also raised under the fourth assignment of error, that her misrepresentation convictions were against the manifest weight of the evidence is rendered moot by our holding that the record does not contain sufficient evidence to support these convictions. In all other respects, the fourth assignment of error is overruled.

### Conclusion

{¶49} The state was not required to present medical evidence that Hartley's repeated administration of melatonin supplements to young children was a violation of her duty of care or protection that created a substantial risk to the health or safety of the children. Further, the evidence supported a finding that Hartley acted recklessly under the circumstances in creating this substantial risk. Accordingly, in the appeals numbered C-100515, C-100516, and C-100517, we affirm Hartley's endangering-children convictions.

{¶50} The misrepresentation by a child-care provider, under R.C. 2919.224 on its face, does not apply to omissions. The record contains insufficient evidence to

---

[22] See *Tibbs v. Florida* (1982), 457 U.S. 31, 102 S.Ct. 2211; see also *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

[23] See *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.

support a conviction under this statute. Accordingly, in the appeals numbered C-100518, C-100519, and C-100520, we reverse Hartley's misrepresentation convictions and discharge her from further prosecution for those offenses.

Judgment accordingly.

SUNDERMANN, P.J., and HENDON and CUNNINGHAM, JJ., concur.