[Cite as *In re M.D.*, 2023-Ohio-845.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: M.D. | : | APPEAL NOS. | C-220052 |
| | | | C-220053 |
| | : | | C-220054 |
| | | | C-220055 |
| | : | | C-220056 |
| | | TRIAL NOS. | 20-999-z |
| | : | | 20-1000-z |
| | | | 20-1001-z |
| | : | | 20-1002-z |
| | | | 20-1007-z |
| | : | | |
| | : | *O P I N I O N.* | |

Appeals From: Hamilton County Juvenile Court

Judgments Appealed From Are: Affirmed.

Date of Judgment Entry on Appeal: March 17, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Ron Springman*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Joshua A. Thompson*, Assistant Public Defender, for Defendant-Appellant.

**Bock, Judge.**

{¶1}    In these consolidated appeals, defendant-appellant M.D. challenges his five delinquency adjudications. For the following reasons, we affirm his adjudications.

## I.    Facts and Procedure

{¶2}    Over the course of two weeks in February 2020, two food delivery drivers were robbed at gunpoint in the parking lot of an apartment complex located at 3221 Queen City Avenue in Cincinnati, Ohio. When a third order was placed requesting delivery to a neighboring apartment complex, police surveilled the parking lot and arrested defendant-appellant M.D. That night, two officers interrogated M.D. over the course of four hours. While M.D. was advised of his rights in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the officers did not respond to M.D.'s request for an attorney during the interrogation.

{¶3}    The state charged M.D. with acts that, if committed by an adult, would constitute three counts of aggravated robbery in violation of R.C. 2911.01, one count of obstructing official business in violation of R.C. 2921.31, and one count of tampering with evidence in violation of R.C. 2921.12(A). The aggravated-robbery and tampering-with-evidence charges carried firearm-facilitation specifications. The state unsuccessfully moved for the juvenile court to relinquish its jurisdiction and transfer the case to the adult court. The juvenile court denied the state's request, finding M.D. amenable to care or rehabilitation within the juvenile system. In December 2020, M.D. moved to suppress his statements to the officers during the interrogation on the night of his arrest. The juvenile court failed to hold a hearing or issue an order granting or denying his motion to suppress.

{¶4}    Ten months later, the juvenile court held an adjudicatory hearing. The state presented testimony from delivery drivers Gregory Teetor and Robert Suesz, and Cincinnati Police Officers Andrew Snape, Ryan Delk, and Detective Turner. In addition, the state entered the signed *Miranda* waiver, interrogation video, gun, ammunition, magazine, test-fire round, and cell phone into the evidence.

### February 16 Robbery

{¶5}    Beginning with the first robbery, Gregory Teetor described the night that he was robbed while delivering food for Papa John's. According to Teetor, the restaurant received an order from "Mike" for delivery to 3221 Queen City Avenue. Teetor entered the lobby of the complex and rang the apartment bell. There was no answer. When he turned to leave, he encountered "four guys standing there." Later, he recalled three teenagers, but it "could have been four." One pointed a gun at Teetor and instructed, "give us everything you got." Teetor described the gun as "real enough for me to not try my luck," noting that it had a "handle" and "slide." Teetor surrendered $42 and a pizza. On the night of the robbery, Teetor was unable to describe the clothing of the teenagers. In court, however, Teetor recalled that one of the teenagers wore a "black skull cap and a black bubble coat," and another wore brown- or khaki-colored pants and jacket. And in court, Teetor identified M.D. as one of the perpetrators.

### February 21 Robbery

{¶6}    Turning to the second robbery, Robert Suesz testified that he was working at Queen City Pizza as a delivery driver when the restaurant received a late-night order for delivery to an apartment at 3221 Queen City Avenue. When he arrived and knocked on the door, there was no response. Suesz recalled that, upon leaving, he saw "three or four guys" with "bandanas or something" covering their faces. He ran to his car, but someone chasing Suesz "kicked the door onto his leg" before he was able

3

to shut the door. The person "stuck the butt of the gun on my window," but "decided to let [him] go." Suesz clarified that he "saw a butt of something," but "didn't know what it was." And he testified that he "didn't see a gun," rather just "something on my window." Suesz feared for his life and believed, "for a split second," that he could be shot. Suesz left without surrendering any money or food.

<u>February 23 Robbery</u>

{¶7} Teetor testified that, on February 23, he was in the restaurant when employees received an order for delivery from the same phone number that had placed the February 16 order. The restaurant called the police.

{¶8} Sergeant Andrew Snape testified that he investigated a possible delivery-driver robbery at 3225 Queen City Avenue. Snape and other officers "set up" around the apartment building. In an unmarked car with "very dark tinted windows," Sergeant Snape sat with his partner in the unlit apartment parking lot at night. Sergeant Snape recalled seeing someone walk out of the apartment complex and across the parking lot, weaving through some parked cars and "came up on the passenger's side of our vehicle." Later, he explained that, despite the tinted windows and darkness, he "could see movement," "could see shapes," and "could determine colors to some extent." He believed that the person was holding "what appeared to be a firearm." Sergeant Snape specified that he "could see a black object" in the person's hand, held "forward and down." Sergeant Snape testified that M.D. was "holding a dark object that appeared to be not a cell phone but it was much bigger. It was black and it was pointing down."

{¶9} According to Sergeant Snape, after he "opened the door [with his] firearm out," M.D. ran through the apartment complex, weaving between the buildings, before officers found M.D. "hiding in a dumpster at the corner of the

4

apartment complex." During the chase, Sergeant Snape and other officers yelled for M.D. to stop. When M.D. was found in the dumpster, he was unarmed and was holding a cell phone. A gun was later found on an embankment "along the path where he ran." The state entered the gun, ammunition, magazine, and cell phone into the evidence.

Interrogation

**{¶10}** Detectives Delk and Turner described their investigation and interrogation of M.D. Detective Delk recalled securing a search warrant for M.D.'s phone, which ultimately produced a "phone download printout." According to Detective Turner, the officers identified "a few different numbers" used to call the restaurants, one ending in 8495, which "was used multiple times." In addition, Detective Delk described the protocol for advising a person in custody of his *Miranda* rights and the use of a standardized form, which M.D. signed.

**{¶11}** Detective Turner described M.D.'s confession of his participation in the robberies—"eventually [M.D.] admitted to me he used the phone number to make calls to pizza places to have food delivered so that robberies could occur." The state played two 30-minute parts of the four-and-a-half-hour video. While Detective Turner recalled that M.D. initially denied any involvement, he testified that M.D. confessed to making the phone calls and having a gun on the night of the arrest.

**{¶12}** The juvenile court adjudicated M.D. delinquent for every offense. The court found that M.D. used a firearm to facilitate the aggravated robberies and obstruction of official business. In particular, the trial court noted that M.D.'s confession established that he "clearly [was] aware of the plan" and "had an involvement." According to the trial court, M.D. was "not only there but admitted to" making the call on February 16. Turning to February 21, the juvenile court stated that M.D. confessed to "making the phone call, that [he] was present, [he] w[as] aware that

5

the plan was to rob the pizza delivery driver, [he] knew that it was a setup, [he] used the name Michael, the same address, and again used the app on [his] phone, and again [he] denied having the firearm." For the February 23 robbery, the juvenile court relied on the "same method of operation and motive" confessed to by M.D., as well as his admission of possessing his friend's "firearm and that [his] plan was to rob the pizza delivery driver."

{¶13} The juvenile court issued five separate dispositional orders. For the February 23 robbery, the juvenile court ordered an indefinite term of commitment to the custody of the Department of Youth Services ("DYS") with a minimum of 24 months, not to exceed M.D.'s 21st birthday, and a consecutive "additional period of 36 months" for the accompanying "specification(s)." For the February 16 and 21 robberies, M.D. was ordered to serve an indefinite term of commitment with a minimum of 24 months, not to exceed his 21st birthday. Turning to the tampering-with-evidence offense, M.D. was ordered to serve an indefinite term of commitment, with a six-month minimum, not to exceed his 21st birthday. Finally, the juvenile court remitted all court costs for the obstruction-of-justice offense.

{¶14} Initially, M.D. challenged the juvenile court's adjudications in two assignments of error. But following oral arguments, this court ordered supplemental briefing to address the issue of M.D.'s request for an attorney. *See State v. Magee*, 2019-Ohio-1921, 136 N.E.3d 800, ¶ 25 (6th Dist.), quoting *State v. Vinson*, 2016-Ohio-7604, 73 N.E.3d 1025, ¶ 66 (8th Dist.); *see also State v. Slagle*, 65 Ohio St.3d 597, 604, 605 N.E.2d 916 (1992).

## II.    Law and Analysis

{¶15}  M.D. raises three assignments of error. First, he argues that the juvenile court committed plain error when it failed to rule on his motion to suppress. Second, M.D. contends that the juvenile court's adjudications were supported by insufficient evidence and against the manifest weight of the evidence. Third, M.D. maintains that he received ineffective assistance of counsel. For ease of analysis, we discuss these arguments out of order.

{¶16}  We begin with M.D.'s third assignment of error. He argues that his trial counsel was constitutionally ineffective for failing to raise M.D.'s request for an attorney and his parents in the motion to suppress. In the interrogation video, M.D. asked the detectives, "Can I have a lawyer?" But in M.D.'s motion to suppress, he moved to exclude "any and all oral statements made by [M.D.]" which he broadly alleged were "taken in violation of [M.D.]'s rights guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution." His motion made no reference to any request for a lawyer.

### Ineffective Assistance of Counsel

{¶17}  In light of state and federal constitutional guarantees of effective assistance of counsel, "we consider 'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *State v. Solorio*, 1st Dist. Hamilton No. C-210526, 2022-Ohio-3749, ¶ 33, quoting *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In other words, a court considering an ineffective-assistance-of-counsel claim based on trial counsel's failure to file a motion to suppress must determine if there was "deficient performance and prejudice." *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 226, quoting *Strickland* at 687.

7

Trial counsel's failure to raise an argument in a motion to suppress, or file a motion to suppress, does not render trial counsel's assistance per se ineffective. *See State v. Trowbridge*, 1st Dist. Hamilton No. C-110541, 2013-Ohio-1749, ¶ 53, citing *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65. Rather, this type of ineffective-assistance claim requires proof that there was a basis to suppress the evidence in question. *Brown* at ¶ 65.

1. *Deficiency*

**{¶18}** Beginning with the deficiency prong, counsel's assistance was deficient if it " ' "fell below an objective standard of reasonableness." ' " *State v. Nash*, 1st Dist. Hamilton Nos. C-210435 and C-210436, 2022-Ohio-1516, ¶ 14, quoting *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002), quoting *Strickland* at 687-688. This review is deferential and carries a presumption that the conduct in question may be considered "sound trial strategy." *State v. Hackney,* 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, ¶ 37.

**{¶19}** When considering whether trial counsel was deficient for not raising a suppression argument, a defendant fails to meet his burden of proving that his attorney violated an essential duty if "the record contains no evidence which would justify the filing of a motion to suppress." *Neyland* at ¶ 126, quoting *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 208, quoting *State v. Gibson*, 69 Ohio App.2d 91, 95, 430 N.E.2d 954 (8th Dist.1980). In other words, we must determine whether the omitted challenge had arguable merit. *See Brown* at ¶ 65; *see also State v. Payton*, 119 Ohio App.3d 694, 704, 696 N.E.2d 240 (11th Dist.1997) ("[w]here there exist reasonable grounds for filing a motion to suppress, counsel's failure to file the motion may constitute ineffective assistance and warrant reversal.").

8

**{¶20}** M.D. argues that he unambiguously requested an attorney. The Fifth and Fourteenth Amendments to the United States Constitution guarantee an individual accused of a crime the right "to be free from compelled self-incrimination during custodial interrogation." *Fare v. Michael C.*, 442 U.S. 707, 709, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), citing *Miranda*, 384 U.S. at 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. As Chief Justice Warren explained, "the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege [against self-incrimination]." *Miranda* at 469. And so, when *Miranda* rights are knowingly waived, "law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Davis v. United States*, 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). When an individual "*unambiguously* request[s] counsel," the " 'interrogation must cease until an attorney is present.' " *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 74-75, quoting *Davis* at 459, and *Miranda* at 436. At that point, that individual " 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations to police.' " *Tench* at ¶ 75, quoting *Edwards v. Arizona,* 451 U.S. 477, 484-485, 101 S.Ct. 1880, 68 L.E.2d 378 (1981).

**{¶21}** Neither trial counsel nor appellate counsel raised M.D.'s request for an attorney during his interrogation until after the initial appellate oral argument when we ordered briefing on that matter. The parties dispute whether M.D.'s request was unambiguous and unequivocal. M.D. says yes. The state maintains that M.D.'s invocation of his right to an attorney was unclear because the officers did not hear M.D.'s request. But the circumstances surrounding M.D.'s request suggest otherwise.

**{¶22}** At roughly 85 minutes into the video, M.D. acknowledged that he called Papa John's on February 23 and placed a delivery order for his friends but maintained that he left the apartment shortly after placing the call. He insisted he knew nothing of "the plan." He told officers he left the apartment and proceeded through the parking lot, to his grandmother's house, when a car door opened, and a gun emerged. So he ran. He denied taking part in the February 16 and 21 robberies. Detective Turner replied, "I need you to be honest with me." M.D. insisted that he was. Detective Delk challenged M.D.—"you know what that means? You're going to jail for all of these robberies." Again, M.D. replied that he called in the delivery order on behalf of friends.

| | |
|---|---|
| Det. Turner: | Why were you outside with a gun? |
| M.D.: | Outside with a gun? I did not have no gun. |
| M.D.: | I am [being honest]. I don't have to lie about something I just told you. |
| Det. Turner: | You can't sidestep that fact. |
| M.D.: | Can I have a lawyer? |
| Det. Turner: | You can't sidestep that fact. |

While Detective Turner continued to press M.D., Detective Delk plainly reacted to M.D.'s request. At a minimum, "Can I have a lawyer?" is an unequivocal invocation of the right to counsel and made with sufficient clarity when it elicits a physical response.

**{¶23}** Following M.D.'s request, United States Supreme Court precedent required Turner and Delk to "immediately cease questioning him until an attorney is present." *Davis,* 512 U.S. at 462, 114 S.Ct. 2350, 129 L.Ed.2d 362; *see also State v. Kottner,* 1st Dist. Hamilton No. C-120350, 2013-Ohio-2159, ¶ 29. An interrogation becomes unconstitutional when a suspect's "request for counsel was never fulfilled." *State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983). The constitution

demands that the individual " 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations to police.' " *Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, at ¶ 75, quoting *Edwards*, 451 U.S. at 484-485, 101 S.Ct. 1880, 68 L.E.2d 378. This is a bright-line test—" 'if a defendant requests counsel, the police must stop all questioning and interrogation immediately.' " *State v. Madden*, 1st Dist. Hamilton No. C-210537, 2022-Ohio-2638, ¶ 5, quoting *State v. Knuckles*, 65 Ohio St.3d 494, 495, 605 N.E.2d 54 (1992). An interrogation is "any words or actions on the part of the police * * * that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.,* quoting *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In *Madden*, this court held that after a request for an attorney, an officer asking "several times whether he wanted to talk to them, and stat[ing] that they wanted to talk to him" were calculated to elicit an incriminating response by the suspect. *Id.* at ¶ 16. Here, Detective Turner continued pressing M.D. on his involvement, remarking "you can't sidestep that fact." Turner continued questioning the truth of M.D.'s claim that he was not involved in the robberies. On that basis, M.D. has demonstrated that his Fifth Amendment claim had arguable merit.

**{¶24}** Next, we conclude that trial counsel's assistance fell below an objective standard of reasonableness. Nothing in the record suggests that raising these claims at the suppression stage would have amounted to a futile act. This is not a case of an attorney attempting to " 'maneuver within the existing law, declining to present untested or rejected legal theories.' " *State v. Osie,* 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 219, quoting *State v. McNeill*, 83 Ohio St.3d 438, 449, 700 N.E.2d 596 (1998). Rather, trial counsel was presented with a clear application of state

11

and federal precedent to M.D.'s interrogation. And the United States Supreme Court has recognized the profound impact a confession has on a trial, admonishing that "[a] confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.' " *Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 LEd.2d 302 (1991), quoting *Bruton v. United States*, 391 U.S. 123, 139, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (White, J., dissenting). Despite a clear application of well-established precedent to M.D.'s statements, trial counsel failed to raise obvious Fifth Amendment claims. There is nothing in the record that would excuse trial counsel's omission of these claims at the suppression hearing. Thus, trial counsel was deficient.

2. *Prejudice*

{¶25} While we hold that M.D. has proved that trial counsel's performance was deficient for failing to raise this claim, we hold that he failed to prove that he suffered prejudice. In an ineffective-assistance claim, prejudice is "a reasonable probability that the outcome of the proceedings would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* When a juvenile challenges an adjudication, we must ask " 'whether there is a reasonable probability that, absent the error, the factfinder would have had a reasonable doubt respecting guilt.' " *State v. Bunch*, Slip Opinion No. 2022-Ohio-4723, ¶ 26, quoting *Strickland* at 695. According to *Strickland,* a "reasonable probability" is more than "some conceivable effect," but less than "more likely than not [the error] altered the outcome of the case." *Strickland* at 693. In other words, if the remaining "evidence regarding his guilt was overwhelming," the error would not have affected the outcome of the proceedings. *State v. White*, 82 Ohio St.3d 16, 24, 693 N.E.2d 772 (1998).

12

{**¶26**} We start with the robbery adjudications. When we excise the interrogation statements from the evidence in the record, the testimony from the delivery drivers and Sergeant Snape established that Teetor was robbed by three-to-four Black teenagers at the entrance of an apartment complex located at 3221 Queen City Avenue while attempting to deliver food to "Mike" on February 16. In court, Teetor identified M.D. as one of the robbers, though that identification was equivocal at times. Similarly, testimony established an attempted armed robbery of Suesz by three-to-four Black teenagers at the entrance of 3221 Queen City Avenue on February 21. Teetor's testimony connected the phone number used on February 16 to the February 23 order, which M.D. admitted to making before he requested an attorney. M.D.'s admission to making the February 23 call, combined with Teetor's identification of M.D. and explanation that the same number placed the delivery orders on February 16 and 23, tie M.D. to both robberies. And the February 21 robbery is tied to the February 16 robbery through the address of the delivery, and to the February 16 and 23 robberies through the manner and method used.

{**¶27**} Because the evidence connects M.D. to the robberies, we hold that the outcome of M.D.'s delinquency adjudication for tampering with evidence in violation of R.C. 2921.12(A)(1) would not have been different. Under R.C. 2921.12(A)(1), tampering with evidence requires proof that M.D. knew "an official proceeding or investigation [was] in progress, or [was] about to be or likely to be instituted," and that M.D. "altered, destroyed, concealed, or removed" a thing "with purpose to impair its value or availability as evidence in such proceeding or investigation." R.C. 2921.12(A)(1). Considering the nature of the offenses, M.D.'s knowledge that an investigation was likely can be inferred. *See State v. Martin,* 151 Ohio St.3d 470, 2017-

Ohio-7556, 90 N.E.3d 857, ¶ 116-117. And Sargeant Snape's testimony, while circumstantial, establishes that M.D. possessed and attempted to conceal a gun.

**{¶28}** And we find no prejudice in M.D.'s adjudication for obstructing official business under R.C. 2921.31(A). The juvenile court explained that M.D. "clearly ran" and officers found him hiding in a dumpster. The statute criminalizes any act "that hampers or impedes a public official in the performance of the public official's lawful duties." R.C. 2921.31(A). We agree that, initially, M.D. was "simply a teenager who ran from a person he saw getting out of the car with a gun." But Sergeant Snape testified that he, and other officers, later identified themselves as officers and instructed M.D. to stop. Under the statute, flight from an officer attempting a lawful *Terry* stop constitutes a violation of Ohio's obstructing-official-business statute. *State v. Lohaus,* 1st Dist. Hamilton No. C-020444, 2003-Ohio-777, ¶ 11. Likewise, hiding from police officers who are attempting a lawful *Terry* stop violates R.C. 2921.31(A). *See State v. Botos*, 12th Dist. Butler No. CA2004-06-145, 2005-Ohio-3504, ¶ 16.

**{¶29}** In sum, M.D. has not proven that there was a reasonable probability that, absent trial counsel's error, the juvenile court would have had a reasonable doubt of M.D.'s guilt for the aggravated-robbery, obstructing-official-business, and tampering-with-evidence adjudications. *See Strickland,* 466 U.S. at 695, 104 S.Ct. 2052, 80 L.Ed.2d 674. While we hold that M.D.'s trial counsel was deficient when he failed to raise arguably meritorious claims in the suppression motion, M.D. has failed to prove that he received ineffective assistance of counsel in violation of his Sixth Amendment rights. We overrule his third assignment of error.

<u>Plain Error</u>

**{¶30}** In his first assignment of error, M.D. argues that the juvenile court committed plain error when it failed to hold a hearing or rule on his motion to suppress. To establish that the juvenile court committed plain error, M.D. must show that the court committed an error, which was obvious, and "affected the outcome of the trial." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Generally, a court's failure to rule on a pending motion is construed as a denial of that motion when the court enters a final judgment. *See State v. Pate,* 8th Dist. Cuyahoga No. 95382, 2011-Ohio-1692, ¶ 33. The parties agree that Juv.R. 22(D)(3) mandates that a motion to suppress unlawfully obtained evidence "must be heard before the adjudicatory hearing," and that the record indicates that the juvenile court contravened Juv.R. 22(D)(3) when it failed to hear M.D.'s motion. But our prejudice analysis compels us to conclude that M.D. has failed to prove that the error affected the outcome of the trial. Thus, we overrule M.D.'s first assignment of error.

<u>Sufficiency and Manifest Weight</u>

**{¶31}** Turning to his second assignment of error, M.D. contends that his delinquency adjudications were against the sufficiency and manifest weight of the evidence. In a sufficiency challenge, we view the evidence in a light most favorable to the state and determine if " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *State v. Hartley*, 194 Ohio App.3d 486, 2011-Ohio-2530, 957 N.E.2d 44, ¶ 23 (1st Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In other words, there must be "some competent, credible evidence" for each element of the offense. *State v. Caton*, 137 Ohio App.3d 742, 750, 739 N.E.2d 1176 (1st Dist.2000).

**{¶32}** In contrast, under a manifest-weight standard, this court "reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." *In re B.M.,* 1st Dist. Hamilton No. C-170103, 2018-Ohio-1733, ¶ 9, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).

**{¶33}** We begin with the aggravated-robbery adjudications. Under the statute, no person, when "attempting or committing a theft offense * * * shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it." R.C. 2911.01(A)(1). A theft offense is defined by R.C. 2913.01(K)(4) as a " 'conspiracy or attempt to commit, or complicity in committing' a theft in violation of R.C. 2913.02(A)(1), which 'prohibits the purposeful deprivation of property from another by knowingly exerting or obtaining control over that property without consent of the owner.' " *State v. Tenbrook*, 12th Dist. Butler No. CA2020-01-005, 2020-Ohio-5227, ¶ 11.

**{¶34}** The evidence established that three to four teens brandished a gun to deprive Teetor of money and food on February 16, without Teetor's consent. The evidence connects M.D. to that robbery. Likewise, the evidence connects M.D. to the attempted armed robbery Suesz on February 21. The phone number and name used to order the food on February 23, and the testimony of Sergeant Snape establishes that M.D. attempted to commit aggravated robbery on the night of his arrest. While there are some discrepancies in Teetor's and Sergeant Snape's testimony, a reasonable factfinder could find that M.D. committed the acts underlying these adjudications.

16

And despite those discrepancies, M.D.'s adjudications were not against the manifest weight of the evidence.

{¶35}   Next, M.D. was adjudicated delinquent for acts that, if committed by an adult, would constitute tampering with evidence in violation of R.C. 2921.12(A)(1). The statute states that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation." R.C. 2921.12(A)(1).

{¶36}   Sergeant Snape's testimony established that M.D. had a gun and that a gun was recovered within a close proximity of M.D.'s path as he ran from Sergeant Snape. Again, we can infer from the nature of the crimes that M.D. had knowledge that an investigation was in progress. Therefore, sufficient evidence supported his delinquency adjudication for tampering with evidence. While we recognize that Sergeant Snape's testimony hinted that M.D. was holding something other than a gun, the juvenile court found his testimony and demonstration credible. The juvenile court was " ' "in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony [was] credible." ' " *State v. Nettles*, 1st Dist. Hamilton No. C-180535, 2019-Ohio-3682, ¶ 17, quoting *State v. Saunders*, 1st Dist. Hamilton No. C-160781, 2017-Ohio-8557, ¶ 9, quoting *State v. Strider-Williams*, 10th Dist. Franklin No. 10AP-334, 2010-Ohio-6179, ¶ 13. Giving deference to the juvenile court's credibility finding, we hold that M.D.'s adjudication was not against the manifest weight of the evidence.

{¶37}   Finally, M.D. was adjudicated delinquent for acts that, if committed by an adult, would constitute obstructing official business in violation of R.C. 2921.31(A). A delinquency adjudication for obstructing official business requires evidence that

17

M.D. " '(1) performed an act; (2) without privilege; (3) with purpose to prevent, obstruct, or delay the performance of a public official of any authorized act within the public official's official capacity; and (4) that hampered or impeded the performance of the public official's duties.' " *State v. Brantley*, 1st Dist. Hamilton No. C-210258, 2022-Ohio-597, ¶ 16, quoting *State v. Buttram*, 1st Dist. Hamilton No. C-190034, 2020-Ohio-2709, ¶ 10, citing *In re Payne,* 1st Dist. Hamilton No. C-040705, 2005-Ohio-4849, ¶ 11.

{**¶38**} First, M.D. argues that the state failed to establish that he lacked privilege to run from Sergeant Snape. Specifically, M.D. contends that Sergeant Snape lacked a justification for stopping M.D. But Sergeant Snape testified that M.D. approached the unmarked car with what appeared to be a gun in his hands. And the officers were investigating a possible armed robbery. There was reasonable and articulable suspicion of criminal activity to justify a *Terry* stop. *See In re M.P.,* 1st Dist. Hamilton Nos. C-130663 and C-130741, 2014-Ohio-2846, ¶ 10.

{**¶39**} Second, M.D. asserts that the state failed to show that he knew he was running from the police. M.D. relies on Sergeant Snape's testimony that the parking lot was dark, Sergeant Snape's car was unmarked and had heavily tinted windows, to argue that M.D. was unaware that Sergeant Snape was a police officer and that he ran out of a fear for his own personal safety, rather than "with [a] purpose to prevent, obstruct, or delay the performance of a public official." *See* R.C. 2921.31(A). Considering the circumstances, we agree that M.D. likely ran out of concern for his personal safety. Yet, Sergeant Snape testified that he and other officers identified themselves as police officers and instructed M.D. to stop. This court has held that flight after receiving instructions from an officer to stop falls "squarely within the statute's proscriptions." *State v. Lohaus*, 1st Dist. Hamilton No. C-020444, 2003-Ohio-777,

¶ 12. And so, when we view the evidence in a light most favorable to the state, a rational trier of fact could have found that M.D. committed the essential elements of obstructing official business in violation of R.C. 2921.31(A).

**{¶40}** Third, M.D. argues that the weight of the evidence proved that he was holding a cell phone in the parking lot, undermining the argument that Sergeant Snape was attempting a lawful stop of M.D. But again, we defer to the juvenile court's finding that Sergeant Snape's testimony regarding the gun was credible. Therefore, this is not an exceptional case where the evidence weighs heavily against the conviction, or a case where the juvenile court clearly lost its way and created a manifest miscarriage of justice. M.D.'s second assignment of error is overruled.

### III. Conclusion

**{¶41}** In conclusion, we overrule M.D.'s three assignments of error and affirm the juvenile court's delinquency adjudications.

Judgments affirmed.


**ZAYAS, P.J.,** and **WINKLER, J.,** concur.


Please note:

The court has recorded its entry on the date of the release of this opinion.