[Cite as *State v. Olah*, 2023-Ohio-2113.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- v -

SAMANTHA M. OLAH,

        Defendant-Appellant.

**CASE NO. 2022-A-0031**

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2018 CR 00758

**O P I N I O N**

Decided: June 26, 2023
Judgment: Reversed

*Colleen M. O'Toole*, Ashtabula County Prosecutor, *Christine Davis*, Assistant Prosecutor, and *Christopher R. Fortunato*, Assistant Prosecutor, Ashtabula County Prosecutor's Office, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*William P. Bobulsky*, William P. Bobulsky Co., LPA, 1612 East Prospect Road, Ashtabula, OH 44004 (For Defendant-Appellant).

JOHN J. EKLUND, P.J.

{¶1} Appellant, Samantha Olah, appeals her conviction of Endangering Children, a third-degree felony in violation of R.C. 2919.22(A)(E). For the following reasons, the judgment of the Ashtabula County Court of Common Pleas is reversed.

{¶2} On April 25, 2018, Police Sergeant David Bonfield was dispatched to 81 East Main St., Orwell, Ohio, after receiving a call that a three and a half year old child, Brantley Gilbert, had fallen down the stairs and was unresponsive. Samantha and her mother, Valorie Olah, were watching Brantley that night and had been his babysitters for

approximately six months. The paramedics later arrived and transported him to a Geauga County hospital. He was life-flighted to Rainbow Babies and Children's Hospital, where he was pronounced brain dead and died two days later of a brain hemorrhage.

{¶3} The facts and circumstances surrounding this case are both tragic and unfortunate, and we sympathize with Brantley's loved ones in grieving his early death.

{¶4} The grand jury indicted Valorie and Samantha on seven counts: Count 1: murder, an unclassified felony in violation of R.C. 2903.02(A); Count 2: murder, an unclassified felony in violation of R.C. 2903.02(B); Count 3: involuntary manslaughter, a first-degree felony in violation of R.C. 2903.04(A); Count 4: involuntary manslaughter, a first-degree felony in violation of R.C. 2903.04(A); Count 5: felonious assault, a second-degree felony in violation of R.C. 2903.11(A)(1); Count 6: endangering children, a second-degree felony in violation of R.C. 2919.22(B)(1)(E)(2)(d); and Count 7: endangering children, a third-degree felony in violation of R.C. 2919.22(A)(E).

{¶5} Valorie and Samantha both pled not guilty to all counts. Valorie's and Samantha's cases were consolidated for trial. On February 15, 2022, a jury trial began. Before voir dire, the state moved to dismiss counts 1, 2, 3, and 5. The court granted the motion.

{¶6} Valorie and Samantha both elected to testify at trial. Samantha testified that she had begun watching Brantley in November 2017, after Brantley's mother, Beverley Santiago, whom Samantha had known her entire life, reached out to her on Facebook asking her to babysit Brantley. (T.p. 859). Samantha described that Beverly worked 24-hour shifts as a paramedic and needed someone to watch Brantley overnight during her shifts. Samantha testified that Valorie, whom she lived with, "would help as-needed" and

2

when Samantha worked her other job at a call center. (T.p. 860). Samantha and Valorie resided in a house that had been turned into several apartments. Their apartment was at the top of stairs when you entered the house, with the stairs leading directly up to a landing. To the left of the landing was the living room and kitchen and to the right of the landing was the bedrooms. Samantha testified to the general procedure of walking Brantley and other children by the stairway:

> Any time we went up the steps from outside, me or my mother, Valorie, would follow behind them. If we went down the steps, one of us would be in front of them and one of us would be behind him. In the house itself, going from the living room to the kitchen, there was a gate there to stop them, if they tried to enter the kitchen. There was also a gate from the kitchen to the hallway, which was a secondary measure to also stop them, if they made it past the first one. And then there was also the gate we kept across the steps in the hallway.

{¶7} Samantha testified to the events leading up to Brantley's fall on April 25, 2018:

> He and my mother were in the living room watching TV and playing with toys. I was in the kitchen making my son a bottle. My niece was already in bed sleeping, and my son was in his crib. My mother had to take down the gate from the living room to the kitchen. They walked through the kitchen. She took down the gate from the kitchen to the hallway and carried that one with her, because that one got put up at her bedroom doorway. She would have been leading Brantley, and I was just finishing up making my son Jackson's bottle, and turned and caught out of the very corner of my eye, [Brantley] starting to fall down the steps. * * * I was right behind him. I wasn't sure if Brantley had tripped over his own feet or rug. [sic] * * * I ran after him. I was, unfortunately, unable to go fast enough to be able to catch him. * * * He landed at the bottom. He was on his side. I picked him up, cradled him and took him back upstairs. * * * He was still breathing, at that time. * * * I carried him up the steps, laid him on my mother Valorie's bed. I called his mother. She asked that I call 911 and so I did. And then 911 advised me not to move him any further. I didn't. And, at that point, I went out on the porch to meet Officer Bonfield and direct him upstairs. (T.p. 875-876, 927).

3

{¶8}    Samantha testified that there was a gate at the top of the landing, but that at nighttime, they always left the gate open "if there was a fire, that was the only entrance and exit in and out of the apartment." (T.p. 880). Samantha explained that Valorie had just opened the gate for the night when Brantley fell. She described that when either herself or Valorie would walk Brantley to bed, one of them would usually open the gate for the night as they walked past. (T.p. 909). Samantha also stated that there was a rug on the top of the landing that had been "disturbed" and appeared flipped over on one side after Brantley had fallen. (T.p. 911). Samantha last testified that there was also a box at the top of the landing that most visitors had to walk around when walking through the hallway. (T.p. 909). She stated that she was able to walk through the hallway straight through because there was still 32 ½ inches of free space to walk. (T.p. 911).

{¶9}    Valorie also testified to the events leading up to Brantley's fall: "[W]e was in the living room and watching TV and he was playing, and he said, Grandma, I want to go to bed. So, we got up, I removed the gate between the kitchen and the living room so we could go through. He followed me through after I took it down, and I removed the gate from the hallway to the kitchen so we could go through there. And as we was going to the bedroom, I was carrying the gate in my left hand and opened the gate at the steps with my right hand." (T.p. 946). She stated that as she passed the stairwell that night, she "opened that gate on the way through, because we always opened it at night for a safety issue, so if there was emergency, a fire, anything in the house that we had to get out quickly, 'cause it was our only entrance." (T.p. 961). Valorie testified that Brantley was behind her and that she assumed "[h]e tripped on something and he come through behind me" and fell down the stairs. (T.p. 947). Valorie testified that she had initially reported to

4

Sergeant Bonfield that Brantley may have tripped over the rug on the way from the kitchen to the bedroom, causing his fall, but that she was not sure if he did "[b]ecause when he came in, the rug was flipped up, but I didn't know if that was from Brantley or if that would have been from Samantha coming through there to try to get down the steps to catch him." (T.p. 980-981). She stated that the rug was on carpet at the top of the landing, but that the rug had "some" rubber on the back, and that she had "always" had rugs there. (T.p. 980).

{¶10} The state called Sergeant Bonfield to testify. He testified that Samantha met him when he arrived and directed him "inside and up the stairwell" where he saw "several items strewn about on the stairwell and further into the residence." (T.p. 373). Sergeant Bonfield described the stairwell as "very steep. There were quite a few stairs to get to the top landing area." (T.p. 373). He then described, "I noticed a safety gate that was affixed to the very top of the stairwell. Um, it was connected to the wall and was meant to -- it appeared that it was meant to attach to the banister railing area." (T.p. 373). Sergeant Bonfield testified that the gate was not securing off the stairwell. (T.p. 374). He testified that he was then directed to the bedroom where Brantley was resting and described Brantley as looking "limp" and "essentially lifeless." (T.p. 375).

{¶11} Sergeant Bonfield next stated that he drove Valorie and Samantha to the police department and interviewed them. He testified that Samantha reported that "she was in the kitchen area as Valorie was leading in front of Brantley past the top of the stairwell, Brantley was in tow directly behind Valorie; and it was explained to me that Samantha was following behind, a few feet behind Brantley as they were passing the stairwell prior to the fall." (T.p. 401). Sergeant Bonfield testified that during his interview

5

with Samantha, "[t]here was mention about the rug on the top of the stairs. It was a loose rug that was placed at the top of the stairs, um, and it appeared out of normal condition. There was a corner of the rug that was kind of folded on itself and disturbed a little." (T.p. 401). He testified that Valorie "mentioned in similar fashion that the rug appeared at the top of the stairwell and that there was concern that it may have contributed to the fall." (T.p. 402).

{¶12} Sergeant Bonfield testified that he returned to the residence the next day to take pictures and measurements of the apartment. The police department produced a diagram of the apartment, which the state offered into evidence. The diagram shows the stairwell leading up to the landing with the kitchen to the left and the bedrooms to the right. The diagram shows that there is a drawer and a box at the top of the landing, leaving 32 1/2 inches to walk on the landing past the stairwell from the kitchen to the bedrooms.

{¶13} Sergeant Bonfield last testified that he had interviewed Samantha and Valorie four times each during his investigation and that neither's statements had changed "in any great detail in reference to the fall itself down the stairwell." (T.p. 410).

{¶14} Brantley's mother, Beverly, and his father, Nicholas Santiago, testified. Neither was present when Brantley fell. Beverly testified that she had asked Samantha and Valorie in the month prior to Brantley's death to keep a closer watch on him because he was "clumsy." (T.p. 517). Beverly recounted that on April 25, 2018, Samantha had called her and notified her that Brantley fell, but that "[i]t took her a minute or two to tell me, like, that he wasn't acting right" and that she told Samantha to call 911. (T.p. 439).

6

{¶15} Nicholas testified that "I had actually been to the Defendants' house, ah, to pick up my son, ah, in January, and when I saw all the hoarding and everything, um, I told her she needed to change babysitters right then and there, ah, because I did not want my son in that sort of condition." (T.p. 539).

{¶16} The state called Dr. Erica Armstrong, the medical examiner who performed Brantley's autopsy, to testify. She testified that Brantley's cause of death was "acute pneumonia with respiratory failure, due to cardiopulmonary arrest with hypoxic ischemic encephalopathy and multisystem organ failure, due to blunt force injuries of head, trunk and extremities, with brain, skeletal and soft tissue injuries." (T.p. 590). Dr. Armstrong stated her conclusion that "[t]he manner of death was classified as homicide" and explained "[h]omicide is defined as the willful actions or inactions of another that causes the death of the other individual." (T.p. 609). She explained that she made her classification because prior abuse could have caused Brantley's death.[1] Dr. Armstrong also described the different bruises on Brantley's body and explained that because the bruises were different colors, she believed some bruises occurred before he fell.

{¶17} The defense called an expert, Dr. Janice Ophoven, a forensic pediatric pathologist, to rebut Dr. Armstrong's testimony. She testified that the defense had asked her "to perform an independent forensic analysis of the death of little Brantley, um, which is, ah, a very specific process. It's the equivalent of a second -- of a second medical opinion." (T.p. 637). Dr. Ophoven explained that she had performed a differential diagnosis on Brantley, which compiles all of his previous known injuries and the injury

---

1. Count 6, endangering children, contained an element of abuse, but, as explained later, the court dismissed this count after the state rested its case on a Crim.R. 29 motion for acquittal. This is because the case did not present sufficient evidence that Brantley had been abused.

7

causing his death to determine the classification of death. (T.p. 650). She explained that there was too much unknown to classify Brantley's death as a homicide because he had older injuries and bruises, so she had classified his death was "undetermined." (T.p. 651). Dr. Ophoven concluded that "[u]nfortunately, the medical examiner's verdict speaks to and in my opinion leaves a very large gap in the determination of what happened by excluding the history of prior falls and the fall down the stairs." (T.p. 675). Dr. Ophoven's determined that abuse did not contribute to Brantley's death. (T.p. 675).

{¶18} The state rested its case. Out of the presence of the jury, the defense then objected to the state's exhibits: the medical examiner's verdict, the autopsy report, and the medical examiner's photographs of Brantley's body. The court overruled the objections. The defense attorneys then moved the court to dismiss all remaining counts under a Crim.R. 29 motion of acquittal. The court overruled the motion as to counts 4 and 7, but granted the motion as to count 6, agreeing that the state had not presented evidence that either defendant abused Brantley.

{¶19} Samantha and Valorie Olah then testified. The defense next called six witnesses who generally testified that the Olahs were loving and caring babysitters who had watched their children in the past and that they had no concerns about the Olahs' care of their children.

{¶20} The defense rested its case. The defense attorneys again moved to dismiss the remaining counts under a Crim.R. 29 motion of acquittal. The court denied the motion as to both counts.

{¶21} Among other jury instructions, the court presented the jury with an "accident jury instruction: "An accidental result is one that occurs unintentionally and without any

8

design or purpose to bring it about. An accident is a mere physical happening or event out of the usual order of things and not reasonably anticipated as a natural or probable result of a lawful act." (T.p. 1088). The defense proposed a jury instruction on negligence, but the court denied the proposed jury instruction, explaining that negligence was not an element of any of the crimes.

{¶22} On February 27, 2022, the jury returned with its verdicts. The jury found Valorie guilty of committing Endangering Children, a third-degree felony in violation of R.C. 2919.22(A)(E), and Involuntary Manslaughter, a first-degree felony in violation of R.C. 2903.04(A). The jury found Samantha guilty of Endangering Children, a third-degree felony in violation of R.C. 2919.22(A)(E), and not guilty of Involuntary Manslaughter.

{¶23} On March 17, 2022, the court sentenced Valorie to imprisonment for a minimum term of 11 years with a maximum term of 16 and-a-half years. On March 23, 2022, the court sentenced Samantha to a maximum term of 3 years imprisonment.

{¶24} Samantha timely appeals and raises three assignments of error. The third assignment of error is dispositive of this appeal and renders the first two assignments moot.

{¶25} Third assignment of error: "The trial court committed prejudicial error by failing to grant Defendant-Appellant's motions for acquittal in that the verdict was contrary to the manifest weight of the evidence."

{¶26} "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." Crim.R. 29. Under Crim.R. 29(A),

9

Case No. 2022-A-0031

"a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 261 (1978), at syllabus. "Thus, when an appellant makes a Crim.R. 29(A) motion, he or she is challenging the sufficiency of the evidence introduced by the state." *State v. Patrick*, 11th Dist. Trumbull Nos. 2003-T-0166, 2003-T-0167, 2004-Ohio-6688, ¶ 18.

{¶27} "'Sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the [factfinder] or whether the evidence is legally sufficient to support the [factfinder's] verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), citing Black's Law Dictionary (6 Ed.1990) 1433. The appellate court's standard of review for sufficiency of evidence is to determine, after viewing the evidence in a light most favorable to the prosecution, whether a rational trier of fact could find the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶28} When evaluating the sufficiency of the evidence, we do not consider its credibility or effect in inducing belief. *Thompkins* at 387. Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law. *Id.* This naturally entails a review of the elements of the charged offense and a review of the state's evidence. *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13.

{¶29} When evaluating the weight of the evidence, we review whether the inclination of the greater amount of credible evidence, offered in a trial, to support one

10

side of the issue rather than the other indicated clearly that the party having the burden of proof was entitled to a verdict in its favor, if, on weighing the evidence in their minds, the greater amount of credible evidence sustained the issue which is to be established before them. "Weight is not a question of mathematics but depends on its effect in inducing belief." *Thompkins* at 387. Whereas sufficiency relates to the evidence's adequacy, weight of the evidence relates the evidence's persuasiveness. *Id.* The reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

{¶30} The trier of fact is the sole judge of the weight of the evidence and the credibility of the witnesses. *State v. Landingham*, 11th Dist. Lake No. 2020-L-103, 2021-Ohio-4258, ¶ 22, quoting *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). The trier of fact may believe or disbelieve any witness in whole or in part, considering the demeanor of the witness and the manner in which a witness testifies, the interest, if any, of the outcome of the case and the connection with the prosecution or the defendant. *Id.,* quoting *Antil* at 67. This court, engaging in the limited weighing of the evidence introduced at trial, is deferential to the weight and factual findings made by the factfinder. *State v. Brown*, 11th Dist. Trumbull No. 2002-T-0077, 2003-Ohio-7183, ¶ 52, citing *Thompkins* at

11

390 and *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph two of the syllabus.

**{¶31}** A finding that a judgment is supported by the manifest weight of the evidence necessarily means the judgment is supported by sufficient evidence. *State v. Arcaro*, 11th Dist. Ashtabula No. 2012-A-0028, 2013-Ohio-1842, ¶ 32.

**{¶32}** Here, we find that the state did not provide sufficient evidence to sustain the verdict as a matter of law.

**{¶33}** R.C. 2919.22(A) provides, "No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."  Any person who violates R.C. 2919.22(A) is guilty of endangering children.  R.C. 2919.22(E).

**{¶34}** "[T]he culpable mental state of recklessness is an essential element of the crime of endangering children.  *State v. Adams*, 62 Ohio St.2d 151 (1980), paragraph one of the syllabus.  R.C. 2901.22(C) provides: A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature."  *State v. Velazquez*, 11th Dist. Ashtabula No. 2018-A-0027, 2018-Ohio-5068, ¶ 29.

**{¶35}** In this case, it is undisputed that Samantha was a person in "control" or "in loco parentis" over Brantley, who was three and a half years old when he died.  The state, however, did not prove that she acted "recklessly."

12

{¶36} The state argues that Samantha's apartment had "obvious dangers" that created a "substantial risk" to Brantley's welfare. It asserts that the Olahs' apartment was full of clutter and tripping hazards and that paths to walk were narrow. An ACCS supervisor at one time had observed that the "gate at the top of the stairs was not functional, not sturdy, not safe, it was broken" but, because of that, "gates were placed at the top and bottom of the stairs."

{¶37} Drawing all reasonable inferences in favor of the state, we can conclude that the apartment generally was cluttered and posed some risks to occupants. The question here, however, is whether they posed a significant risk to Brantley on the stairway landing that night. On that score, the evidence showed that there were more than 32 inches of open passageway there. That was more than ample space for a toddler and two adults to pass through safely single file. This did not pose a substantial risk to the Brantley's safety. The evidence otherwise only showed that there was a rug on the floor at the top of the stairway. But, again, there was no evidence to suggest it ever had proven to be even a minor issue to traversing the landing with Brantley or anyone else. Nor was there any evidence that the condition of the landing was any different on the tragic night than it had been since November 2017 when the Olahs first started babysitting Brantley. We fail to see that the overall condition of the apartment or the landing area posed a "substantial risk" to Brantley's welfare.

{¶38} That alone might lead us to conclude that Samantha's conviction should be reversed as having insufficient evidence or being against the manifest weight of the evidence. However, the most troubling aspect of this case is the absence of evidence to prove that she acted with "heedless indifference" to the consequences of her actions. To

13

prove Samantha acted "recklessly," the state had to prove that she acted with "heedless indifference", which is more than negligence. *Cleveland v. Richmond*, 8th Dist. Cuyahoga No. 79834, 2002 WL 42951, *2 (Jan. 10, 2002). In *Richmond*, the court reasoned that "in the child endangerment context length of time of one's behavior may define the core of whether that behavior was negligent or reckless." *Id.* Here, the evidence was clear that the events of that fateful night occurred in the blink of an eye, were isolated, were not part of a pattern of conduct, and were completely out of the ordinary sequence of events, rather than a reflection of Samantha's heedless indifference to the consequences of her actions.

{¶39} The state offered no direct evidence of Samantha's mental state at the time of this horrible event. In fact, it offers no analysis in its brief to support this element of the crime for which Samantha was convicted. We discern from the record that while Valorie leading Brantley to a bedroom to sleep, Samantha was only a few steps behind them and tried catching Brantley as he fell. Indeed, a careful review of the record reveals no evidence that would suggest, much less prove, any history of trips or falls on the landing at the top of the stairs.

{¶40} The quality of the evidence presented below may have demonstrated a momentary lapse in care or judgment, but it was insufficient for any reasonable juror to find beyond a reasonable doubt that Samantha acted recklessly. Given all the circumstances the record reveals, we find that the risk of Brantley's falling down the stairs was not a substantial risk on that night, and that appellant did not act with heedless indifference to the consequences of her actions.

14

Case No. 2022-A-0031

{¶41} Samantha's third assignment of error has merit. Her first and second assignments are rendered moot.

{¶42} The judgment of the Ashtabula County Court of Common Pleas is reversed. Appellant's conviction is vacated, and Appellant is hereby discharged.

MATT LYNCH, J.,

EUGENE A. LUCCI, J.,

concur.

Case No. 2022-A-0031