[Cite as *State v. Hoff*, 2024-Ohio-5837.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 30060 |
| | : | |
| v. | : | Trial Court Case No. 2023 CR 01879 |
| | : | |
| AARON HOFF | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on December 13, 2024

. . . . . . . . . . .

CHIMA R. EKEH, Attorney for Appellant

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1}   Aaron Hoff appeals from his conviction for endangering children.   For the following reasons, the judgment of the trial court will be affirmed.

**Procedural History and Facts**

{¶ 2} Hoff was indicted on one count of endangering children on July 5, 2023; the

victim was one of Hoff's infant daughters. He was tried by a jury in January 2024, found guilty, and sentenced to an indefinite prison term of five to seven and a half years.

Evidence Presented at Trial

{¶ 3} Hoff and his fiancée ("Mother") had twin daughters, who were born in January 2023. In the summer of 2023, Mother, Hoff, their infant daughters, and Mother's brother, D.J., resided together in Grandmother's home. On Sunday, June 25, 2023, while Mother was at work, Grandmother observed Hoff come downstairs carrying one of the infants, the victim, between 10 and 11:00 a.m. With his back to Grandmother, Hoff stated that the victim had "some kind of weird dent in her head." Grandmother immediately went to the victim and observed a "big dent" that "a golf ball could fit in" on the baby's head. Grandmother had never seen the dent before and she "freaked out."

{¶ 4} Grandmother and Mother both worked at Stillwater Center. After Grandmother observed the "dent" in the victim's head, Grandmother called their supervisor to request that Mother be sent home from work. While waiting for Mother, Hoff did not tell Grandmother what had happened to the victim. Grandmother got the victim ready to go the hospital, Mother arrived home, and Hoff and Mother took the baby to the hospital. Grandmother remained at home with the victim's twin sister before proceeding to the hospital later in the day. Once there, Grandmother advised Hoff that he should "have just said something so we could have gotten her to the hospital hours ago"; Hoff lunged at Grandmother, cussing, and then was "thrown out of the hospital." Grandmother did not see Hoff again.

{¶ 5} On cross-examination, Grandmother estimated that Mother had come home

from work around 1:30 p.m. Hoff called Grandmother from the hospital and said that he had been Googling stuff and that "it could be cancer." Grandmother stated that she understood "that someone else in the household had heard a blood-curdling scream coming from the baby." Grandmother did not hear the scream, which she learned had occurred around 6:00 a.m. after Mother left for work. Grandmother's bedroom was down a hallway, and she testified that she doesn't hear anything from back there. Grandmother identified photos of the victim's injury and acknowledged that the photos did not depict blood, bruising, or lacerations. Grandmother stated that Hoff had not believed that the victim needed to go to the hospital and instead had suggested that she be taken to the pediatrician the following day.

{¶ 6} Mother testified that the twins were born early at 34 weeks and remained in intensive care for two weeks. Prior to the incident, Hoff stayed with the twins while Mother worked first shift, and then she stayed with them while he worked second shift. Hoff worked the evening before the injury; the next morning, before Mother left for work, she texted Hoff, who was in the basement, to come upstairs so he could hear the babies if they cried. As she left for work around 5:25 a.m., Mother observed Hoff go into the room she shared with him and close the door; the twins were in their nursery in the next room, in separate cribs, at the time. When asked what she thought upon learning that one of the girls had been injured while she was at work, Mother responded, "[t]hat [Hoff] had did something to her." She had never known the victim to have any type of dent in her head.

{¶ 7} Hoff did not tell Mother what had happened to the child until they were at the

hospital. Then he told Mother that he had "accidently put her in the crib too hard, and she might have hit the side of the dresser." The victim remained in the hospital for three days, and she required careful care from Mother upon her release as well as follow-up medical care. Mother had last seen the victim prior to the injury around 2:00 a.m. when she fed and changed the twins with a light on in the room; neither of them was injured at that time. She identified photos of her daughter "with a skull fracture."

{¶ 8} D.J., who was Mother's brother and Grandmother's son, lived in the house with them and testified that he had known Hoff for 10 years at the time of the victim's injury. D.J. testified that, on that morning, he was awakened very early by the "blood curdling" screams of a baby. Concerned, he got up and entered the room from which he had heard the cry without knocking. D.J. observed Hoff "hunched over the bed" with "his hands over the baby's head." He did not know which baby was in distress. It was dark in the room, and D.J. did not observe any injuries to the children. He did not know of any previous health issues with either baby. D.J. asked Hoff if everything was okay, and Hoff did not respond. D.J. went back to bed because he didn't want to "overstep" with Hoff and he "didn't think [Hoff] could do something like that." D.J. went to the hospital later that day, and he spoke to the police there. Hoff texted D.J., "trying to explain what it could be and that he maybe put her down [in] the crib too hard or something." D.J. testified that he "put one and two together . . . [Hoff] was the only one with her. And there was something messed up with her head." D.J. observed Hoff drinking beer the night before the incident.

{¶ 9} Dr. Adwoa Achampong, a medical social worker at Dayton Children's

Hospital, spoke to Hoff and Mother on the day of the victim's injury. Hoff told her that he did not know what had happened to the victim. He advised that he had fed both babies that morning, neither were in distress, he had no concerns, and he put them back to bed. Achampong stated that she then consulted the child advocacy team at the hospital, which specializes in suspected abuse and neglect.

{¶ 10} Officer Collin Coomer of the Dayton Police Department ("DPD") was dispatched to the hospital on a report of the victim's injury, and he spoke to Achampong, Mother, Grandmother, and D.J. He further observed the victim's injury, namely "a depression on the left side of her head." Coomer spoke to Hoff around 5:00 p.m.; Hoff was "not specific" about what had happened to the victim, but he said that he hadn't hurt her and she may have been injured when he was putting her into the crib. Coomer detained Hoff, who was taken to the Safety Building.

{¶ 11} DPD Detective Steven Ettinger was assigned to Care House, a child advocacy center associated with Dayton Children's Hospital. He responded to the hospital on the date of the injury around 7:00 p.m. When he arrived, the victim's twin had been brought in and was being examined for any potential injuries, which is a common practice when another child in a home has been abused. There were no concerns as to the victim's sister. Mother was present, and after speaking with her, Ettinger proceeded to the "family room" in the emergency department, where D.J. and his girlfriend were waiting. D.J. described to Ettinger the "scream" he had heard that had concerned him enough to get up. When D.J. was unable to specify the time of the scream, his girlfriend advised that she knew when it was because D.J. had texted her

early that morning about being awakened by a baby. After looking at her phone, she advised Ettinger of the time.

{¶ 12} Ettinger then proceeded to the critical care unit where the victim had been taken for observation. When he arrived, the victim was in Grandmother's arms, and Grandmother and Mother were attempting to feed her. Ettinger observed an injury on the left side of her head, toward the back. He spoke to Grandmother privately, and after obtaining permission to take pictures at her home, he proceeded there with Detective Dole, who took photos identified by Ettinger. Ettinger noted that the photos depicted "a bassinet butted up against the end table or dresser" that contained a "very thin net material."

{¶ 13} After obtaining the photographs, the detectives proceeded to the Safety Building to interview Hoff. Ettinger read Hoff his rights before asking any questions, and the interview, which occurred at around 11:00 p.m., was audio and video recorded. The interview was played for the jury. Ettinger had obtained Hoff's cell phone at that time and confirmed that Hoff had conducted searches relating to a head injury.

{¶ 14} Jennifer Tendler, a board-certified physician in general pediatrics on the child advocacy team at the hospital, consulted with the victim's primary care providers upon a report of possible child maltreatment. She reviewed the victim's medical records and obtained a history from Mother. She then examined the victim, finding a notable and palpable depressed skull deformity, as well as a flattening of the left posterior portion of her skull. Tendler identified the injury in the photographs. She further identified 3D reconstructions from the victim's head CT, which reflected a depressed skull fracture in

the left parietal bone. Tendler did not observe bleeding at the injury site and noted that visible bleeding does not always occur with a skull fracture. Based upon the totality of her evaluation, Tendler concluded that the injury was consistent with trauma and that it had not been present since birth. She testified that such an injury requires a significant amount of force and that babies can display a variety of behaviors when in pain, including screaming and crying. Tendler stated that the victim's injury would not have spontaneously occurred or have resulted from the normal care of an infant. It was significant to Tendler that the victim was not ambulatory and accordingly had been unable to cause her own injury. She made a diagnosis of "suspected child physical abuse."

{¶ 15} On cross-examination, Tendler stated that the victim's type of injury is often referred to as a "ping-pong fracture" because "it almost always appears as if it has left an impression of a spherical object like a ping pong ball." She acknowledged that she was unable to determine who had caused the injury. She testified that, if a clear and consistent history of an accident had been reported, it would have been considered as a cause of the injury. Tendler had not spoken to Hoff.

{¶ 16} Hoff raises four assignments of error on appeal

**Weight and Sufficiency of the Evidence**

{¶ 17} We will consider Hoff's first two assignments of error together, which are:

APPELLANT'S CONVICTION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST

WEIGHT OF THE EVIDENCE.

{¶ 18} According to Hoff, the State presented insufficient evidence with regard to recklessness. Hoff asserts that the victim suffered serious harm as the result of an accident, but that the State failed to prove "heedless indifference." He concedes that the crib was too close to the dresser, but he argues that "when a child is injured as a result of some hazard, it is the substantial risk of injury that controls, not the outcome." According to Hoff, there was no evidence to suggest that the dresser had ever been a hazard in the past or that the bed was in a different condition at the time of the injury. Citing *State v. Olah,* 2023-Ohio-2113, ¶ 37 (11th Dist.), Hoff asserts that the circumstances did not present a "strong possibility" that the child would be injured in this case. Hoff asserts that the evidence was clear that the events occurred in the blink of an eye, were isolated, were not part of a pattern of conduct, and "were completely out of the ordinary sequence of events," rather than a result of his heedless indifference to the consequences of his actions.

{¶ 19} In his second assignment of error, Hoff argues that Tendler's testimony conflicted with other evidence presented at trial and that the injury to the child could have been accidental. Hoff notes that he acknowledged to Coomer that the child could have been hurt when he put her in the bed and states "it is not implausible that a father, taking care of two infants, may have been sleepy, in the dark, and may have mistakenly hit her head on the dresser without realizing that it caused a dent in her head." According to Hoff, the fact that he did not immediately know what had happened did not necessarily mean that he did not take responsibility, noting that he sought answers on Google.

{¶ 20} A sufficiency of the evidence argument relates to a dispute concerning whether the State "presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997). The test for sufficiency of the evidence was set forth in *State v. Jenks*, 61 Ohio St.3d 259 (1991):

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus. In other words, on review for sufficiency, courts are to assess not whether the State's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. *Thompkins* at 390.

{¶ 21} A weight of the evidence argument, on the other hand, challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *Wilson* at ¶ 12, citing *State v. Hufnagel*, 1996 WL 501470, *3 (Sept. 6, 1996). The proper test to apply to a manifest weight of the evidence inquiry is set forth in *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983), which states:

> . . . [T]he court, reviewing the entire record, weighs the evidence and

all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered . . .

"In order to find that a manifest miscarriage of justice occurred, an appellate court must conclude that a guilty verdict is 'against,' that is, contrary to, the manifest weight of the evidence presented." (Citation omitted.) *Wilson* at ¶ 14.

{¶ 22} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Flores-Lopez*, 2017-Ohio-690, ¶ 49 (2d Dist.), citing *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.); *accord State v. Robinson*, 2015-Ohio-1167, ¶ 17 (2d Dist.). As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Flores-Lopez* at ¶ 49, citing *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

{¶ 23} The statute proscribing endangering children states that no person shall abuse a child under 18 years of age. R.C. 2919.22(B)(1). Recklessness is an essential element of the crime of endangering children. *State v. Webber,* 2015-Ohio-2183, ¶ 10 (2d Dist.), citing *State v. McGee,* 79 Ohio St.3d 193, 195 (1997). "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain

result or is likely to be of a certain nature." R.C. 2901.22(C). Further, a "person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." *Id.*

{¶ 24} "A reckless act involves a more culpable mental state than a negligent act: 'A person acts negligently when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that his conduct may cause a certain result or may be of a certain nature.' " *State v. Hartley,* 2011-Ohio-2530, ¶ 31 (1st Dist.), quoting R.C. 2901.22(D). "But a reckless act involves less culpability than a knowing act: 'A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably be of a certain nature.' " *Id.*, quoting R.C. 2901.22(B).

{¶ 25} "Substantial risk" is defined as a "strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). "A child endangering conviction may be based upon isolated incidents or even 'a single rash decision' in which a parent recklessly puts his or her child's health or safety at risk." *State v. Lucas*, 2024-Ohio-842, ¶ 66 (8th Dist.), quoting *State v. James,* 2000 WL 1843196 (12th Dist. Dec. 18, 2000). "To prove the requisite 'substantial risk' element, . . . there must be some evidence beyond mere speculation as to the risk of harm that could potentially occur due to a single imprudent act." *State v. Hughes*, 2009-Ohio-4115, ¶ 21 (3d Dist.), quoting *Middletown v. McWhorter*, 2006-Ohio-7030, ¶ 11 (12th Dist.).

{¶ 26} "[N]ot surprisingly, child endangerment cases are typically fact-specific."

*State v. Bush*, 2020-Ohio-772, ¶ 8 (1st Dist.), citing *Beachwood v. Hill*, 2010-Ohio-3313, ¶ 21 (8th Dist.). "When evaluating recklessness, courts generally review [multiple] facts such as the period of time the parent or guardian left the child unsupervised, the age of the child, whether the parent had any notice of the substantial risk (such as awareness of the child's propensity to engage in risky behavior) and any precautions the parent took to negate the risk." *Id.,* citing *State v. Greenlee*, 2012-Ohio-1432, ¶ 15 (2d Dist.).

{¶ 27} *Olah,* 2023-Ohio-2113 (11th Dist.), involved an ambulatory child who fell down a flight of stairs from an upstairs landing and died as a result of his injuries. The child was in the care of a babysitter and her grandmother at their apartment, which was at the top of the stairs when one entered the house, with the stairs leading directly up to a landing. To the left of the landing were the living room and kitchen, and to the right of the landing were the bedrooms. *Id.* at ¶ 6.

{¶ 28} The babysitter-defendant testified regarding her general practice of walking the children past the stairway. When climbing the stairs, either she or her grandmother followed behind them. There were gates between the living room and the kitchen, between the kitchen and the hallway, and across the stairs. *Id.*

{¶ 29} Specifically regarding the child's fall down the stairs while being led to bed, the babysitter testified that her grandmother had removed the gate from the living room to the kitchen in order to pass through. The grandmother removed the gate between the kitchen and the hallway and "would have been leading [the child]," while the babysitter was finishing making her son's bottle, when the babysitter observed the child start to fall. The babysitter was "right behind" the child, and she testified that she wasn't sure if he had

tripped over his own feet or the rug. She stated that she ran after him but was unable to go fast enough to catch him, and he landed at the bottom of the stairs.  *Id.* at ¶ 7.

{¶ 30} The babysitter testified that, at night, she and her grandmother always left the gate blocking the stairs open because that was the only way out of the apartment if there were a fire.  She explained that her grandmother had just opened the gate for the night when the child fell, and she described that whenever one of them walked the child to bed, they would usually open the gate for the night as they walked past.  The babysitter further stated that there was a rug on the top of the landing that had been "disturbed" and appeared flipped over after the child fell.  *Id.* at ¶ 8.

{¶ 31} The grandmother testified consistently with the babysitter as to the events that led up to the child's fall.  She testified that the child had been behind her and that she assumed he had tripped on something prior to falling down the stairs.  The babysitter had immediately contacted the child's grandmother and sought medical treatment for the child.  A sergeant investigating the case noted that he had interviewed the babysitter and her grandmother multiple times, and their stories had remained consistent.  *Id.* at ¶ 13.

{¶ 32} After the babysitter was convicted of endangering children, the Eighth District determined that the State had not "provide[d] sufficient evidence to sustain the verdict as a matter of law."  *Id.* at ¶ 32.  The court noted that, although the apartment was cluttered and posed some risks to the child, at issue was whether a significant risk to the child had existed on the stairway landing on the night of the fall.  *Id.* at ¶ 37.  The "evidence showed that there were more than 32 inches of open passageway there," with "more than ample space for a toddler and two adults to pass through safely single file."

The court found that there had not been a substantial risk to the child's safety. *Id.* The evidence further showed that, although there was a rug on the floor at the top of the stairway, there was no evidence to suggest it "ever had proven to be even a minor issue to traversing the landing." *Id.* Finally, the appellate court concluded there was no evidence that the condition of the landing "was any different on the tragic night" than it had been when the babysitter began caring for the child. *Id.*

{¶ 33} *Olah* noted that "the most troubling aspect of this case" was the absence of evidence that the babysitter had acted with "heedless indifference" to the consequences of her actions. *Olah* quoted *Cleveland v. Michigan*, 2002-Ohio-2 (8th Dist.), which held that " 'in the child endangerment context, length of time of one's behavior may define the core of whether that behavior was negligent or reckless.' " *Id.* at ¶ 38. *Olah* concluded that the "evidence was clear that the events of that fateful night occurred in the blink of an eye, were isolated, were not part of a pattern of conduct, and were completely out of the ordinary sequence of events, rather than a reflection of [the babysitter's] heedless indifference to the consequences of her actions." *Id.*

{¶ 34} The court further found that the State had offered no direct evidence of the babysitter's mental state at the time of this event. *Id.* at ¶ 39. The appellate court discerned from the record that, while the grandmother was leading the child to a bedroom to sleep, the babysitter was only a few steps behind them, and she had tried to catch the child as he fell. *Id.* It was significant to the court that there was no evidence to suggest, much less prove, any history of trips or falls on the landing at the top of the stairs. *Id.* The court held that "[t]he quality of the evidence . . . may have demonstrated a momentary

lapse in care or judgment, but it was insufficient for any reasonable juror to find beyond a reasonable doubt [that the babysitter had] acted recklessly." *Id.* at ¶ 41. *Olah* concluded that the risk of the child's falling down the stairs had not been a substantial risk on that night and that the babysitter had not acted with heedless indifference to the consequences of her actions. *Id.* at ¶ 40.

{¶ 35} Turning to the evidence in Hoff's case, in Hoff's interview with Det. Ettinger. Hoff stated that the victim's head was mishappen at birth, that she was "really tiny still," and that she was not "filling out" like her sister. Hoff stated that, when he left for work around 4:00 p.m. the day before the injury, the victim was fine. He arrived home around 12:45 a.m. and played video games until he went to bed at 2:30 a.m., and the babies were sleeping at that time. The victim was in a portable crib and her sister, who did not like to sleep lying down, was in a baby seat in the room Hoff shared with Mother. Hoff was asleep when Mother left for work.

{¶ 36} According to Hoff, around 6:00 or 7:00 a.m. the victim's twin woke up "really, really upset," waking the victim and causing her to cry. Hoff had a bad headache at the time. He believed the twin was having "gas problems," so he gave her something to calm her stomach. Hoff stated that, afterward, while feeding the other child on the bed with his left hand, he rocked the portable crib containing the victim in a back-and-forth motion with his right hand. The crib was next to a nightstand, with the head of the crib against the front of the nightstand. Hoff stated, "a lot of times I'll actually move [the crib] back," and the "nightstand will get into the netting and it's dark."

{¶ 37} Hoff stated that he propped a blanket up in the crib to allow the victim to

"feed herself" with a bottle. While feeding the other child on the bed with one hand, he continued rocking the crib with the other. He told Det. Ettinger that he did not know if he had rocked or shook the crib too hard.

{¶ 38} Hoff stated that, at one point, he knocked over baby bottles that were on the nightstand, and they fell loudly to floor. When he got up to retrieve them, he "racked" his shin on the baby swing. He cried out, and D.J. entered the room to check on him. Hoff responded, "I just blasted my shin," "I'm okay," and "I'm just super-upset right now."

{¶ 39} After the victim finished eating, Hoff picked her up, changed her diaper, burped her, and put her back in the crib. According to Hoff, she was content at the time. When asked about her injury, Hoff stated that the only explanation he could think of was his repeated rocking motion of the crib with his right hand. He stated that he didn't intend to hurt his child and choked up and began crying.

{¶ 40} Hoff testified that the victim later woke up "happy" and smiled at him. Hoff picked her up and kissed her, and he noticed the dent in her head. He took her downstairs to talk to Grandmother about the dent. Hoff told Det. Ettinger that he did not believe that he hit her head on anything while handling the victim. He stated that he "had been wanting to figure something out" about the dresser, and "I should have done something about the dresser being that close." Ettinger advised Hoff that, based upon what he learned from hospital personnel, the injury was not from him rocking the victim too hard while in the crib; it was more of an impact injury, and it would be helpful for the victim's treatment if Hoff could describe the mechanism of any accident. Hoff stated that he was "half asleep" and "confused," but he did not believe he had hit the victim's head.

{¶ 41} When Det. Ettinger noted that Hoff had been alone with the children, Hoff mentioned "clipping that wood" and indicated that it was possible the victim had hit her head but a "pure accident." He stated, "maybe I laid her down too quick." When asked if he heard any thud-like sound, Hoff stated that the portable air conditioner in the room had been on, along with a regular fan and a ceiling fan, and he had "lullabies on the t.v." Hoff testified that, upon discovering the injury, he wondered whether he had put her down too hard. He stated that the victim did not cry when he put her down, and she exhibited no symptoms of a head injury such as vomiting.

{¶ 42} When asked if the crib is always "up on" the dresser as found by law enforcement and reflected in the photos, Hoff stated that he needed to move it back. He acknowledged having one beer at work before going home on the day of the injury.

{¶ 43} The photos of the room where Hoff and Mother slept showed their bed and the portable crib beside it.[1] The floor was not carpeted, and a portion of the baby seat on the floor was visible against one corner of the crib. The crib mattress appeared to be suspended in its highest position in a manner to accommodate an infant, near the top of the dresser. The mattress was bordered on all sides by a thin black mesh material. The head of the crib directly abutted the front of the dresser to the point that the top portion of the crib appeared to extend over the front edge of the dresser. An empty bottle, a bib, and a lamp were visible on top of the dresser, and the lamp was turned on in one of the photos. On the floor, the legs of the crib extended past the front of the dresser.

---

[1] We note that Mother testified that the twins were sleeping in their separate bedroom when she left for work, but Hoff stated they were asleep in the room he shared with Mother. However, it is undisputed that the victim's injury occurred in Hoff and Mother's bedroom.

{¶ 44} The facts in Hoff's case are distinguishable from *Olah*, 2023-Ohio-2113 (11th Dist.), in that Hoff's conduct involved much more than a momentary lapse in care or judgment. The babysitter in *Olah* exhibited vigilance in the care of the child therein, whereas Hoff repeatedly acknowledged an awareness of the risk of the crib's proximity to the dresser and the resultant need to move it back, yet he left it in place. As noted above, child endangerment may arise from an isolated incident or a single imprudent act. Hoff, alone, was caring for two premature infants, each of whom required his attention simultaneously, in a dark and noisy room. While Mother testified that she turned on the light when feeding the twins around 2:00 a.m., by his own testimony Hoff remained in darkness while taking care of both babies. The photos showed that the light by the bed was operational. Hoff's testimony that he sent baby bottles crashing to the floor from the dresser and "racked" his shin on the baby seat underscores our reasoning.

{¶ 45} In *Olah,* there was no evidence of the babysitter's mental state, but in Hoff's case, Hoff was so defensive when confronted about the passage of time between the injury and his acknowledgement of the need for treatment that he was removed from the hospital. D.J. testified that Hoff was drinking beer the night before the injury, and by his own timeline, Hoff had only slept a few hours and had been half-asleep and confused when the victim was injured. He further stated that he was "super upset" when D.J. entered the room.

{¶ 46} Finally, the jury could have reasonably concluded that the risk caused by all of Hoff's acts and omissions, including the placement of the crib, was substantial and not merely remote or significant. In other words, it could have concluded that Hoff had

disregarded a substantial and unjustifiable risk, and we need not speculate whether Hoff jeopardized the victim's safety. He fractured her skull after placing her in her crib "too hard." The jury reasonably concluded that Hoff's cumulative actions and omissions demonstrated the required mental state herein. Hoff had been drinking, was lacking in sleep, "confused" and "super-upset" after "racking" his shin while caring for two premature infants, each of whom needed his attention simultaneously. The room was dark, although an operational lamp was near the crib, and Hoff failed to negate the substantial risk to the child by simply turning on the light. We conclude that, unlike in *Olah*, the State proved heedless indifference to the consequences of Hoff's conduct, i.e., that Hoff was reckless.

{¶ 47} Having reviewed the entire record, for the reasons set forth above, we conclude that Hoff's conviction for endangering children was supported by sufficient evidence and was not against the manifest weight of the evidence. Accordingly, his first and second assignments of error are overruled.

**Prosecutorial Misconduct**

{¶ 48} Hoff's third assignment of error is as follows:

THE TRIAL COURT ERRED TO HOFF'S PREJUDICE IN ALLOWING THE STATE TO MAKE MULTIPLE IMPROPER COMMENTS IN ITS REBUTTAL CLOSING.

**{¶ 49}** According to Hoff, the State improperly "made misleading insinuations and assertions" and "expressed personal beliefs or opinions regarding [his] guilt" in closing argument. Hoff directs our attention to two portions of the State's rebuttal closing argument:

1.

Could it had [sic] been accident or recklessly? Both of them can be true. You can accidentally be so reckless in that force that you use that causes that skull fracture. You aren't going to go back and say was it accident or was it reckless, because both of them can be true at the same time. We don't have to say that he intentionally did it, but being so reckless, even if you didn't mean to use that much force when you put her down in the bassinet and her head hit the dresser, but it was still reckless because of that headless indifference to that substantial or unjustifiable risk.

**{¶ 50}** Hoff asserts that the prosecutor "misstated the meaning of accident as opposed to recklessness," which could have confused and misled the jury. He asserts, "Obviously, accident and recklessness are wide apart in meaning based on [their] definitions."

2.

. . . Listen to the interview about how he tells the detective, did I accidentally put her down too hard? Kind of quicker than usual? Maybe I caused it when I accidentally put her down. I was half asleep. It was chaotic. He

also said he had this killer headache. He is saying this might have happened because he knows what happened. He knows what happened, and he is saying, well, maybe it happened, because he's trying to kind of step back. He's not taking responsibility.

. . .

There was talk about how [Hoff] was looking up what could've caused this. He was trying to look up what could've caused this injury to deflect what he did, that when he was - - had this killer headache, when all these balls were in the air, when there was a lot going on, and he just used too much force. A substantial amount of force.

{¶ 51} Hoff argues that, although the victim suffered serious physical harm while under his care, the evidence that he acted recklessly in causing the injury was minimal. He asserts that the "prosecutor's personal opinion of guilt carried a lot of weight, and thus, prejudiced Hoff."

{¶ 52} The State responds that, in the absence of any objection by Hoff, plain error analysis applies, and Hoff fails to establish plain error. The State asserts that the prosecutor's comments that the victim's injury could be both an accident and reckless were legally correct and in direct response to Hoff's argument that an "accident" absolved him of the crime. According to the State, there is no evidence that the jury was improperly misled by the State's closing arguments, and whether the injury was caused intentionally or by accident "does not change Hoff's reckless act" of placing the victim into a hazardous location, not seeking help for her, and even "going as far as covering up the

injury when [D.J.] came to his room following the scream." The State argues that, by placing the victim "into the bassinet that Hoff knew was a danger to her," he acted recklessly even if the injury itself was caused by an accident. We agree with the State.

**{¶ 53}** "Prosecutors are afforded wide latitude in the presentation of closing arguments." *State v. Ward*, 2023-Ohio-328, ¶ 61 (2d Dist.), citing *State v. Arrone*, 2006-Ohio-4144, ¶ 126 (2d Dist.); *State v. Lott*, 51 Ohio St.3d 160, 165 (1990). Prosecutors may comment freely on " ' "what the evidence has shown and what reasonable inferences may be drawn therefrom." ' " *Ward,* quoting *Lott* at 165, quoting *State v. Stephens*, 24 Ohio St.2d 76, 82 (1970). " 'Both parties . . . may be 'colorful or creative' [during closing arguments] but not purely abusive, inflammatory, or purely derogatory.' " *Id.,* quoting *State v. Whitaker*, 2022-Ohio-2840, ¶ 96, quoting *State v. Brown*, 38 Ohio St.3d 305, 317 (1988). "We review allegations of prosecutorial misconduct in the context of the entire trial." *State v. Phifer*, 2021-Ohio-521, ¶ 33 (2d Dist.), citing *State v. Stevenson*, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright,* 477 U.S. 168 (1986).

**{¶ 54}** " 'For a prosecutor's closing argument to be prejudicial, the remarks must be 'so inflammatory as to render the jury's decision a product solely of passion and prejudice.' " *Arrone* at ¶ 126, quoting *State v. Williams*, 23 Ohio St.3d 16, 20 (1986). " 'Even if the prosecutor's statements during closing arguments are improper, reversal based upon those statements is warranted only if the statements permeate the entire atmosphere of the trial.' " *Id.*, quoting *State v. Tumbleson*, 105 Ohio App.3d 693, 699 (12th Dist.1995).

**{¶ 55}** Hoff did not object to the above-quoted portions of the State's closing

arguments. "Failure to object waives all but plain error." *State v. Bahns,* 2009-Ohio-5525, ¶ 25 (2d Dist.), citing *McBride v. Quebe,* 2006-Ohio-5128 (2d Dist.). Plain error exists "if the trial outcome would clearly have been different, absent the alleged error in the trial court proceedings." *State v. Rollins,* 2006-Ohio-5399, ¶ 14 (2d Dist.). "Plain error may be invoked only in rare cases, and no error constitutes plain error unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Rutherford,* 2002 WL 398704, *2 (2d Dist. Mar. 15, 2002), citing *State v. Campbell,* 69 Ohio St.3d 38, 41 (1994). To prevail under the plain-error doctrine, the defendant "must show that an error occurred, that the error was obvious, and that there is 'a reasonable *probability* that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." (Emphasis in original.) *State v. McAlpin,* 2022-Ohio-1567, ¶ 66, quoting *State v. Rogers* 2015-Ohio-2459, ¶ 22; *see also State v. Wilks,* 2018-Ohio-1562, ¶ 52.

{¶ 56} We see no plain error, or indeed any error. Based upon our analysis of Hoff's first two assignments of error, his argument that the evidence of his reckless conduct was "minimal" is wholly without merit. We have no doubt that Hoff did not intend to injure his daughter. However, as a result of his reckless conduct, the victim suffered a fractured skull. Hoff admitted putting the child into the crib "too hard," while lacking sleep, in a dark room, and while caring for two babies alone at the same time. We cannot conclude that the prosecutor's remarks set forth above were beyond the evidence and reasonable inferences therefrom, as will be further discussed in Hoff's fourth assignment of error. In other words, we are unpersuaded that, in the absence of the remarks, the result of the trial would have been otherwise. Hoff's third assignment of error is

overruled.

## Ineffective Assistance of Counsel

{¶ 57} Hoff's fourth assignment of error is as follows:

APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶ 58} Hoff argues that the facts herein supported a jury instruction on accident since "the entire case rested on whether it was a reckless act, or an accident."  According to Hoff, had defense counsel requested an accident instruction, it would likely have been given based on the evidence at trial, but if it had been requested and denied, the issue would have been preserved on appeal.  Therefore, Hoff asserts that counsel's failure to request an accident instruction denied him a fair trial.

{¶ 59} The State responds that the only evidence to support Hoff's assertion of an accident came from his own interview with police, in which he claimed there could have been an accident when he set the victim down.  The State notes that its theory of the case was that Hoff's actions prior to and following the accident were reckless, regardless of whether the injury was the result of an accident or was intentionally done.  Accordingly, "the defense of accident was not an affirmative defense."  The State asserts that, because Hoff was not entitled to an accident instruction, counsel was not ineffective in failing to request one, and that even if we were to conclude that he was entitled to such an instruction, the instruction would not have changed the outcome of the trial.

{¶ 60} To establish ineffective assistance of counsel, Hoff must prove that his attorney was ineffective under the well-settled two-prong test from *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under the first prong, Hoff must show that defense counsel's performance was deficient. *Id.* "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "As to the first prong, much deference is given to trial counsel." *State v. Midkiff*, 2022-Ohio-4004, ¶ 24 (2d Dist.). "To demonstrate prejudice in the second prong, 'the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.*, quoting *State v. Bradley*, 42 Ohio St.3d 136, first paragraph of the syllabus (1998).

{¶ 61} "Accident" is defined in the Ohio Jury Instructions as follows: "An accidental result is one that occurs unintentionally and without any design or purpose to bring it about. An accident is a mere physical happening or event, out of the usual order of things and not reasonably (anticipated) (foreseen) as a natural or probable result of a lawful act." Ohio Jury Instructions, CR § 421.01 (Rev. Aug. 2024).

{¶ 62} "Accident is not an affirmative defense. Rather, 'it is a factual defense that denies that the accused acted with the degree of culpability or mens rea required for the offense, when that involves purposeful conduct.' " *State v. Jones*, 2015-Ohio-5029 (12th Dist.), quoting *In re F.D.,*2015-Ohio-2405, ¶ 32 (8th Dist.).

{¶ 63} Here, under these specific circumstances and by Hoff's own admission, the

injury to the victim could have been anticipated and/or foreseen as a result of the location of the crib. Because the definition of accident negates the mens rea of intentional conduct (and not reckless conduct), we cannot conclude that defense counsel was ineffective for failing to request such an instruction. Further, had such an instruction been requested and provided, we conclude that it would not have altered the outcome of the trial. In other words, ineffective assistance of counsel is not demonstrated. Accordingly, Hoff's fourth assignment of error is overruled.

## Conclusion

{¶ 64} We have found that Hoff's conviction of endangering children was supported by sufficient evidence and was not against the manifest weight of the evidence, and that prosecutorial misconduct and ineffective assistance of counsel were not demonstrated. Accordingly, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

LEWIS, J., concurs.

TUCKER, J., concurs:

{¶ 65} Though I concur in the majority opinion, I write separately because, in my view, the placement of the crib in relation to the dresser is not a relevant consideration in the analysis of whether the jury's conclusion that Hoff acted recklessly was supported by the weight of the evidence. But without consideration of the dresser's proximity to the crib, the jury's conclusion was well-supported by the evidence.

{¶ 66} At 5:48 a.m. or so, D.J. was awakened by a "blood curdling" scream and,

upon investigation, he observed Hoff bending over the victim with his hands on her head. At this time, the victim was in Hoff's sole care, and, as an infant, she was incapable of injuring herself.

{¶ 67} Dr. Tendler testified that the victim's depressed skull fracture was caused by trauma, that significant force was involved, and that the injury was not consistent with appropriate infant care. The jury also heard that Hoff informed Mother and D.J. that he had perhaps placed the victim into the crib too hard, and that, in doing so, she may have hit her head against the dresser. In a police interview heard by the jury, Hoff alternatively stated that he may have swung the crib too hard, causing the victim to strike her head on the dresser.

{¶ 68} The evidence, as outlined above, was more than sufficient to support a conclusion that Hoff, while acting in heedless indifference to the consequences, disregarded the substantial and unjustified risk to the victim caused by his forceful (probably violent) placement of the infant into her crib or by his forceful (probably violent) swinging of the crib, with either action resulting in the victim's striking the dresser and sustaining the skull fracture.

{¶ 69} The evidence, as discussed, supported a conclusion consistent with the jury's verdict that Hoff's reckless conduct caused the victim's fractured skull. Without this reckless conduct, the crib's proximity to the dresser was benign. As such, though I don't think the dresser's placement in relation to the crib is a pertinent factor in the recklessness analysis, I concur in the majority opinion.